ELVA WATKINS, Appellee, v. GARRY WATKINS et ux., Appellants.

No. 47185.

(Reported in 31 N. W. 2d 354)

326

MARCH 9, 1948.

Bump & Bump, of Des Moines, and Johnson & Johnson, of Knoxville, for appellants.

Harry deReus, of Knoxville, for appellee.

MULRONEY, C. J.—In September 1929, the defendants, husband and wife, purchased a farm of two hundred acres in Mahaska County, Iowa. When settlement was made on or about March 1, 1930, they borrowed $14,000 from Lora Way and gave her a first mortgage on the real estate. On September 1, 1930, the defendants borrowed $3,280 from plaintiff, Elva Watkins, sister of Garry Watkins, one of the defendants, giving her a note therefor payable September 1, 1937, and a second mortgage on the farm to secure the note. No interest was paid on the note and on November 25, 1932, defendants gave plaintiff a chattel mortgage on certain farm crops and livestock for $3,800 which was to further secure their note to her. Subsequently the Way mortgage was assigned to the American Savings Bank & Trust Company of Burlington, Iowa, as collateral security and the receiver of that institution and the State Superintendent of Banking were threatening foreclosure during the year 1933.

On September 16, 1933, the plaintiff, both defendants, and one Ralph Miner, a field man for the State Banking Department, met at the office of Garry Watkins' attorney in Oskaloosa. Prior thereto defendants had made application for a federal land bank loan and had received some indication it would be allowed in the sum of $7,500. As a result of this conference in the attorney's office a written stipulation of settlement was drawn up between the plaintiff, defendants and the banking department, which was signed by plaintiff and defendants, but it was not signed by the banking department. In the stipulation it was provided:

"That in order to settle said indebtedness [the two real estate mortgages] and cancel the same, the party of the first part [defendants] hereby agrees to pay to the party of the second part [banking department] on or before the 20th day of Febr. 1934, the sum of Seven Thousand Five Hundred ($7,500) Dollars for which sum he has made application to secure from the Federal Farm Loan Corp., and that upon the payment of said sum of $7,500, the said party of the second part and the party of the third part [plaintiff] hereby agree to release their respective mortgages on said premises and to surrender all of the notes and said mortgage indebtedness to the said party of the first part."

The stipulation further provided that a release of plaintiff's real estate mortgage was to be executed and left with the attorney in escrow to be filed if the loan went through and the testimony shows that such a release was executed and left with the attorney. Before plaintiff and defendants left the office of the attorney, but after Mr. Miner had left, an agreement was prepared by the attorney and signed by plaintiff and defendants where, in consideration of plaintiff releasing her chattel mortgage, the defendants transferred by bill of sale about 3,000 bushels of corn on the farm which was to be taken "at the local market price" and "the balance of said indebtedness shall remain due and payable to the said party of the second part [plaintiff]."

While the banking department did not sign the stipulation, it did subsequently receive court approval to settle the Way note and mortgage, on which there was due some $8,700, for $7,500 and the federal farm loan was made and the bank accepted the $7,500 and the plaintiff's two mortgage releases were filed. Plaintiff did not surrender her note but she sold the corn and applied the sale price she received as a credit on the note, and in December 1945 she brought suit for the balance.

The pleadings filed by defendants set up the defenses that the note obligation was settled and compromised by the stipulation which plaintiff signed to enable defendants to secure a federal farm loan, and any side agreement whereby plaintiff was to retain her debt is void and unenforceable and against

public policy; that in September 1933 defendants made a composition with their creditors which composition agreement is enforceable; that in November 1933 plaintiff voluntarily surrendered the written agreement which kept the note alive and such surrender is a waiver of any rights thereunder; and the suit upon the promissory note under the claim of the written agreement to keep it alive is barred by the statute of limitations.

By stipulation of the parties the cause was tried in equity to Honorable Marion G. Kellam, one of the judges of the Fifth Judicial District, but due to his illness the submission was set aside and the case submitted to Judge S. E. Prall upon the transcript of the record and both oral and written arguments by counsel on both sides. The plaintiff and both defendants were present at the later submission but no new evidence or testimony was offered or received. Judge Prall ruled in favor of plaintiff and entered judgment for the balance due on the note.

I. This was a suit upon a note which had been secured by both a real estate and chattel mortgage. Plaintiff admitted both mortgages had been released. The releases were prima facie evidence of the extinguishment of the debt and the burden was upon plaintiff to show that they were not so intended. Larson v. Ames Church of Christ, 213 Iowa 930, 239 N. W. 921, and cases there cited. It is clear, under this record, plaintiff met the burden cast upon her by the releases. The release of the real estate mortgage was no doubt made pursuant to the stipulation. The banking department, a named party in this stipulation, did not sign it. No use was ever made of this stipulation. The receiver of the bank did not use the stipulation in obtaining court approval to scale down the mortgage indebtedness. No copy of the stipulation was ever sent to the federal farm loan bank in connection with the loan application. But aside from the stipulation it is perfectly clear that the defendants knew and understood, when they left their attorney's office on September 13, 1933, that the mortgage releases which plaintiff had executed were not to constitute an extinguishment of the note obligation. In fact they both testified that at that time they understood that plaintiff was to sell the 3,000 bushels

330

of corn and apply the purchase price she received on the note and that they would be bound to pay the balance of the note. Under such a record it is perfectly clear that the parties did not intend the releases to be an extinguishment of the debt.

II. It is the defendants' position that the agreement they entered into with plaintiff affirming the note indebtedness was a "side agreement" or "secret agreement"; that actually the plaintiff had scaled down her indebtedness and agreed to take the 3,000 bushels of corn in full payment, as an inducement to procure from the Federal Land Bank the loan upon the land and any agreement whereby plaintiff was to retain her debt in full was void and unenforceable, and against public policy. Defendants had the burden of proving that the agreement was in contravention of the Emergency Farm Mortgage Act and therefore against public policy. Campbell v. Sutton, 62 Cal. App. 2d 621, 145 P. 2d 91. Defendants cite many cases where secret agreements in violation of scale-down agreements made in order to procure loans from federal farm loan banks have been held void and against the announced public policy of the Emergency Farm Mortgage Act of 1933, 12 U. S. C. A., chapter 7, section 1016(d). Many of these cases are cited with approval in Kraetsch v. Stull, 238 Iowa 944, 960, 29 N. W. 2d 341, 349. See, also, annotations appearing in 110 A. L. R. 250 and 121 A. L. R. 117. The following rule announced in McGinnis v. Rolf, Mo. App., 1945, 189 S. W. 2d 456, 463, which is quoted in Kraetsch v. Stull, supra, will serve as a general statement of the holdings of the cases cited by defendants in this division of their brief:

"The purpose of this law has been held to be twofold. First, it is the purpose of the Federal Land Bank to protect its own financial position as a new creditor of the farmer under such 'scale down' agreements and not to permit the precarious financial condition of credit structure being dealt with to be continued or re-established by obligations of the borrower of which the bank has no knowledge. Secondly, it is the purpose of the act to make it possible for the farmer to continue operations on his farm and to obtain real benefits from the 'scale down' agreement and loan."

■ Defendants do not cite any case where any court has held such an agreement with a creditor who received no part of the proceeds of the loan, void as against public policy. We see no reason to extend the rule to reach such a creditor. As stated in Richmond v. Dubuque & Sioux City R. R. Co., 26 Iowa 191 at page 202:

"* * * the power of courts to declare a contract void for being in contravention of sound public policy, is a very delicate and undefined power, and like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt."

See, also, Cole v. Brown-Hurley Hdwe. Co., 139 Iowa 487, 491, 117 N. W. 746, 748, 18 L. R. A., N. S., 1161, 16 Ann. Cas. 846, where we said:

"So long as the corrupting or impolitic character of the agreement is not so clear as to be readily apparent to the intelligent and impartial mind, the just principles of the law, which hold every man to a fair and full performance of his contract, ought not be made to yield to any doubtful construction of that somewhat variable and altogether undefined thing which we call public policy. While protecting the interests of the public, the rights and interests of individuals are not to be unnecessarily sacrificed."

And in 12 Am. Jur., Contracts, section 172, it is stated:

"Rules which say that a given agreement is void as being against public policy are not to be extended arbitrarily, because 'if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be enforced by courts of justice.' The paramount public policy is that freedom to contract is not to be interfered with lightly. It is the court's duty to sustain the legality of a contract in whole or in part whenever it can do so."

■ There is nothing in the federal statute which would preclude the making of such an agreement, as here made, with

a creditor who is not to receive any of the proceeds of the loan. The act provides:

"No loan shall be made under this section unless the holder of any prior mortgage or instrument of indebtedness secured by such farm property arranges to the satisfaction of the Land Bank Commissioner to ·limit his right to proceed against the farmer and such farm property for default in payment of principal." 12 U. S. C. A., chapter 7, section 1016(d).

But this is a limitation on the power of the commissioner to make the loan. Johnstown Bank v. Runnels, 65 Ohio App. 504, 30 N. E. 2d 709. The plaintiff was not asked to sign anything in connection with this loan save a release of her real estate mortgage lien so that the land bank mortgage would be a first lien. · We again call attention to the fact that the stipulation, which was not signed by the banking department, was not used in any manner to induce the land bank to make the loan. We must assume that the commissioner was satisfied by the mere release of the lien against the real estate. As bearing thereon see Holien v. Staveteig, 70 N. D. 36, 291 N. W. 541.

The economic situation necessitating the enactment of the Emergency Farm Mortgage Act is ably set forth in many of the cases cited by defendants and heretofore referred to, where the courts have annulled secret agreements with creditors who derive some benefit from the refinancing. The decisions generally find the side agreements impolitic as to the public because one of the public purposes that led to the establishment of the Federal Land Bank was to coerce scale-down agreements from creditors of insolvent farmers by offering a fund from which the farmers' creditors can recoup part of their debts if they will forego the balance. Surely it was not any part of the public purpose that led to the enactment of the law to coerce, or in any manner influence creditors to extinguish or waive their debts, without any participation in the fund which the bank made available for creditors. When such a nonparticipating creditor releases a lien to enable the farmer to obtain the federal bank loan, he merely does the farmer a favor. To construe such a concession into a relinquishment of the debt and to say that an agreement affirming the debt would be void,

would serve no public purpose sought to be accomplished by the act. It would be a monstrous public policy that would say the benefactor's reward for a gratuitous release of a lien will be the extinguishment of the debt and no contemporaneous agreement affirming the debt will be allowed. Rather the public purpose, or financial aid to distressed farmers, would more likely follow if the debts of such nonparticipating creditors who voluntarily give up liens that would block the loan, without any agreement to participate in the proceeds of the loan, be held unimpaired. In any event it certainly is not readily apparent to us that the public policy of the act is violated by failing to annul the debt-affirming agreement with a creditor who merely gave up his lien but sought to retain his debt. We see no reason to extend the doctrine to reach creditors who are not benefited by receiving a portion of the proceeds of the loan.

A case quite closely in point is Johnstown Bank v. Runnels, supra. There the debtor had a mortgage against his farm and he owed two judgments in favor of a bank. The debtor made application for a federal land bank mortgage and the commissioner required that the two judgment liens be first satisfied and discharged. The Johnstown bank, which was not to receive any of the proceeds of the federal loan, agreed to and did satisfy the judgment liens of record upon the promise of the debtor to execute a note and chattel mortgage for the amount due under the judgments. The note and chattel mortgage were delivered and the debtor made some payments thereon but subsequently defaulted and the bank sued for the balance. In affirming the judgment for the bank the Ohio appellate court held the giving of the note and chattel mortgage was not contra to federal public policy or any provision of the Federal Emergency Farm Mortgage Act. The opinion points out that:

"The plaintiff bank never was asked to, or did it, agree to a reduction of its debt. It was not benefited by the refinancing. It simply did the debtor a favor by relinquishing its lien and giving the government the prior and first lien on the farm." At page 506 of 65 Ohio App., page 711 of 30 N. E. 2d.

The same can be said of the plaintiff in this case. She

334

did a favor for her brother by releasing her second mortgage so that he could obtain the federal loan. She was not benefited by his obtaining the loan. True, she received 3,000 bushels of corn but the record shows by defendants' testimony that her chattel mortgage was a first lien on 5,000 bushels of corn then on defendants' farm. The commissioner was apparently not concerned with plaintiff's rights, further than to secure a release of the real estate mortgage so that the government would have the first lien against the farm. As stated in the Johnstown Bank case:

"* * * the act was not intended as a general bankruptcy statute to relieve a distressed farm owner of all his indebtedness by the act of a land bank commissioner in sanctioning a government loan."

We hold the agreement whereby plaintiff was to retain the debt represented by the note was not void under federal public policy and not rendered unenforceable by any provision of the Federal Emergency Farm Mortgage Act.

 III. Defendants argue that even if the agreement affirming the note indebtedness was not void, still, plaintiff waived all rights under this agreement. Upon this issue defendants had the burden of proving that plaintiff intentionally relinquished her right to collect the balance of the note or such acts and conduct as warrants an inference of the relinquishment of the balance of the debt. And as stated in Bank of Horton v. Knox, 133 Iowa 443, 448, 109 N. W. 201, 202, the waiver "must be evidenced by an unequivocal and decisive act, clearly proven." The claim here made is based upon the testimony of defendants to the effect that after the agreement was executed in the lawyer's office, Garry Watkins received a letter from his lawyer to the effect that the loan had been approved by the commissioner but before he could secure the money it would be necessary for him to sign an affidavit that it was in full settlement of all of his indebtedness and consequently it would be necessary for him to arrive at an understanding wi his sister and the letter stated: "* * * the contract now ex ing between you and your sister will have to be destroyeu. The defendants stated that upon receipt of this letter, or shortly

after November 10, 1933, they went to see plaintiff who was teaching school at Mitchellville and gave her the letter. They said she read the letter and then went upstairs and returned and handed her signed copy of the contract to Garry, and although Garry testified he did not ask for his note back, he stated she voluntarily said she would get the note sometime when she went to her home town, Bussey, and return it to him. Plaintiff denies this story. She testified that defendants came to Mitchellville but did not show her any letter from the attorney. She stated that defendants told her their attorney wanted to see the contract and she gave it to them and that nothing was said about the note. The note never was returned to defendants. About a month later plaintiff went to the office of defendants' attorney and asked him for the contract and when she didn't get it she retained a lawyer named Hugh McCoy, since deceased, to represent her. She later obtained a copy of the contract from defendants' attorney but it is a fair inference from the entire record that plaintiff was at all times insisting that defendants owed the entire debt. The record shows that about the time plaintiff was demanding her contract back from defendants' lawyer in December of 1933, the representative of the Federal Land Bank in Oskaloosa wrote to the bank receiver telling him: "Mr. Watkins' sister is blowing up on her arrangement for settlement and that is spoiling the whole deal." It was not until July 14, 1934, that Garry Watkins signed the affidavit wherein he swore that the proceeds of the Federal Land Bank loan paid in full all of his indebtedness at the date of the affidavit. Of course this affidavit is not binding on the plaintiff. As stated, the note never was delivered to Watkins. He later tried to force delivery of the note to him by refusing to deliver the corn until plaintiff gave up her note but plaintiff secured the corn in a replevin action and held on to her note. While plaintiff admitted in cross-examination she did not make demand on defendants to pay the balance due on the note until 1945, she certainly showed by her actions that she considered defendants obligated to pay that balance. She went to the trouble of a replevin action, involving her putting up a $4,000 bond, in order to secure the corn her

brother promised to deliver, rather than submit to his demand that she deliver up her note. Under the whole record we agree with the trial court that the defense of waiver was not established.

IV. There is no merit in defendants' proposition that plaintiff's suit is barred by the statute of limitations. Code, 1946, section 614.1(6). The suit, filed in 1945, is upon the note payable in 1937. It is not a suit upon the contract entered into in September of 1933.

V. Likewise the rule, contended for by defendants, that a composition agreement between a debtor and all of his creditors is valid and will bind a creditor to accept less than his full claim, has no application. Under our interpretation, and indeed under defendants' own testimony, the agreements that resulted from the meeting in defendants' attorney's office did not result in any agreement on plaintiff's part to accept less than the full amount of the note in payment. In fact the express agreement was that defendants would be bound to pay the note in full and it is our holding that this agreement was not void nor was it waived by later acts or conduct on plaintiff's part.

The note is for $3,280 with interest at five per cent annually, due September 1, 1937, and if principal and interest are not paid when due it shall bear interest at the rate of eight per cent, payable annually. The trial court entered judgment for the balance due on the note on the date of judgment, or July 25, 1947, in the sum of $4,876.94 with interest thereafter at eight per cent per annum. Defendants contend that after allowing the credits on the note as shown by the sales of corn there was $4,543.39 due on the note on July 25, 1947. Defendants do not show how they arrive at their total. The note shows seven separate credits in the years 1934 and 1935 as follows: January 1, 1934, $315; February 4, 1935, $529.79; April 15, 1935, $27.64; May 2, 1935, $206; April 3, 1935, $21.63; June 21, 1935, $75.40; August 7, 1935, $435.24. Plaintiff contends in argument that $5,047.54 was due on the note at the date of judgment. We compute the amount due on July 25, 1947, somewhat in excess of the trial court's allowance but plaintiff

has not appealed so the judgment cannot be increased but it is affirmed.—Affirmed.

OLIVER, BLISS, HALE, GARFIELD, MANTZ, SMITH, and HAYS, JJ., concur.