**PEOPLES BANK & TRUST COMPANY OF CEDAR RAPIDS, Iowa, Plaintiff-Appellee,**

v.

**Leo A. LALA, Jr., Donna D. Lala, Kellie Jo Lala, and Jay Albert Lala, Defendants-Appellants.**

No. 84–1564.

Court of Appeals of Iowa.

June 4, 1986.

As Corrected Aug. 6, 1986.

Keith E. Uhl of Scalise, Scism, Sandre & Uhl, Des Moines, for defendants-appellants.

James F. Pickens of Pickens, Barnes & Abernathy, Cedar Rapids, for plaintiff-appellee.

Heard by SCHLEGEL, P.J., and HAYDEN and SACKETT, JJ.

SACKETT, Judge.

Defendants Leo Lala, Donna Lala, Kellie Lala and Jay Lala appeal from judgment for Plaintiff Peoples Bank and Trust Company in a mortgage foreclosure action. Defendants contend: (1) recovery from defendants as guarantors was barred when the underlying debt was not plead by Peoples Bank; (2) the evidence was sufficient to establish supersession, release and/or discharge of the mortgage instruments; (3) evidence was sufficient to establish that a release executed by Peoples Bank operated as a release of all obligation; (4) evidence was sufficient to establish lack of consideration; and (5) the evidence was sufficient to establish lack of contractual capacity and/or undue influence. We affirm in part and reverse in part.

Over the course of several years, Peoples Bank extended substantial loans to Leo and Donna Lala individually, to a family-owned farming corporation (JaKel Grain Co.), and to a non-family farming corporation in which Leo owned controlling interest (LDL Farms). These loans were undersecured.

In June, 1978, Peoples Bank asked Leo to sign three separate guaranties relating to the various debts. One of the guaranties Leo signed guaranteed the debts of JaKel to the extent of $200,000. At no time was this guaranty withdrawn.

By April, 1979, exclusive of any guaranties, Leo and Donna personally owed the bank $17,861.93, LDL farms owed $386,-366, and JaKel owed $273,513.24. The total amount owed was $677,740.01. At that time, Peoples Bank sought additional security for the loans. Leo and Donna Lala executed five mortgages between April 10–20, 1979; two of which are the subject of this lawsuit.

On April 13, 1979, Leo was hospitalized in the coronary care unit of St. Lukes Hospital in Cedar Rapids showing symptoms of myocardial infarction. On April 16, 1979, while Leo was still in the hospital, one of the mortgages relevant to this action was signed by Leo and Donna. The instrument was a $100,000 mortgage on Leo's and Donna's homestead. The other mortgage, dated April 19, 1979, secured two industrial lots as collateral for the preexisting debts. The Lalas signed promissory notes at the time each of the two mortgages were executed. No new consideration was given for either note.

Subsequently Peoples Bank attempted to collect the notes and foreclose the mortgages. This action resulted.

At trial conflicting evidence was presented concerning the circumstances surrounding the execution of the instruments at issue. The trial court entered judgment for Peoples Bank finding: (1) the instruments were not invalidated by defective notarization; (2) a release of indebtedness executed by Peoples Bank in 1979 was not a release of all of the Lalas' indebtedness; (3) the release of a co-guarantor was not a

release of the Lalas; (4) an antecedent debt was sufficient consideration to support mortgages given as security; and (5) the actions of Peoples Bank did not relieve the Lalas from liability. Defendants have appealed.

Our review of this equitable proceeding is de novo. Iowa R.App.P. 4. While we give deference to the findings of the trial court, we are not bound by them. Iowa R.App.P. 14(f)(7).

## I.

The Lalas contend the trial court erred in allowing recovery on an "unpled debt." In its petition, Peoples Bank specifically referred to the two mortgages which were the subject of foreclosure. The Lalas claim the failure to mention other notes and the guaranty relating to JaKel precludes recovery. The premise of this argument is that no new debt was created at the time the April, 1979, mortgages were executed. The Lalas contend the debt is represented by the other instruments and therefore it was imperative these other notes be mentioned in the petition. We are not persuaded by this argument.

Iowa is a notice pleading jurisdiction. *Schmidt v. Wilkinson,* 340 N.W.2d 282, 284 (Iowa 1983). The petition must contain a short plain statement showing the pleader is entitled to relief. Iowa R.Civ.P. 69. The petitioner need not set forth specific theories of recovery or ultimate facts. *Sulzberger Excavating, Inc. v. Glass,* 351 N.W.2d 188, 192 (Iowa App.1984). All that is required is that petitioner set forth sufficient facts to give the other party "fair notice" of the claim asserted. *Schmidt,* 340 N.W.2d at 283.

In the instant case, we find this standard has been satisfied. The petition was sufficient to apprise the Lalas of the incidents giving rise to the claim and the general nature of the action. Accordingly, we affirm on this issue.

## II.

The terms of the two real estate mortgages, which are the subject of this foreclosure action, obligate and bind the Lalas for the notes specified in the instruments. The June, 1978, guaranty is the only instrument which personally binds Leo for JaKel's debts. If the instrument is considered ineffective, the Lalas could not be held liable for JaKel's debts under the terms of the mortgages. The record reflects that the principal obligor on most of the unpaid debt was JaKel. Therefore, the validity of the 1978 guaranty and its terms is crucial to Peoples Bank's recovery.

It is the Lalas' claim that the guaranty was superseded, released, or discharged. Specifically, they argue the guaranty was: (1) superseded by other guaranties from the Lalas and from LDL Farms; (2) released when co-guarantor (LDL) was released; and (3) discharged as a matter of law by the acts or conduct of Peoples Bank. We are not persuaded by these arguments.

The terms of the guaranty in question allowed for subsequent guaranties. Thus, it cannot be said that Peoples Bank's acquisition of additional guaranties would affect the terms or supersede the 1978 instrument. The 1978 guaranty specifically provides that it "shall be a *continuing, absolute* and *unconditional* guaranty, and shall remain in full force and effect until written notice of its discontinuance shall be actually received by said Bank...." (emphasis added). It also provides that further extension of credit by Peoples Bank to the debtor (JaKel) and/or acquisition of indebtedness of the debtor by Peoples Bank, even in excess of the amount of the guaranty and without notice to the guarantor, is also authorized. Finally, the instrument states that no act of commission or omission on the part of Peoples Bank with respect to the matter would affect or impair the guaranty.

In essence, the language of the guaranty indicates it secured future debts and allowed Peoples Bank to obtain additional security. Such actions cannot be viewed as affecting the terms of the instrument. We conclude, as did the trial court,

the 1978 guaranty remains effective and was not superseded by the acquisition of additional security. We also conclude that the release of LDL had no effect on Leo's liability. Even assuming LDL could be characterized as a co-guarantor, the terms of the 1978 guaranty specifically provide that Leo's liability would not be affected by any compromise or release of indebtedness. We find that the terms of the agreement are controlling on this issue.

The Lalas' final argument concerning the 1978 guaranty is that the actions of Peoples Bank increased Leo's risk, therefore, the guaranty was discharged. *See Fidelity Savings Bank v. Wormhoudt Lumber Co.*, 251 Iowa 1121, 1127, 104 N.W.2d 462, 466 (1960). The Lalas allege Peoples Bank took over LDL Farms and JaKel with a voting trust and caused the resignation of Leo from LDL. It is further alleged Peoples Bank proceeded to discharge land leases of value, sell hay assets, pay unsecured debt, preferentially select debt to be reduced, release a co-guarantor, and create new debt, all to the detriment of the Lalas.

We agree with the trial court's conclusion that there was insufficient evidence of a trust agreement among the shareholders. *See* Iowa Code § 496A.33 (1985); *Watts v. Des Moines Register & Tribune*, 525 F.Supp. 1311, 1316–23 (S.D. Iowa 1981). Moreover, the actions taken by Peoples Bank were within its authority. It was a proper attempt to liquidate the corporation and pay off JaKel's creditors. By the terms of the guaranty, as well as the mortgages, Peoples Bank could apply the proceeds of any security to any debt. Additionally, the creation of new debt was for the purpose of protecting assets yet to be sold. It related to the winding up and liquidation of JaKel. We find no basis for reversal.

## III.

The Lalas contend a mortgage release filed June 27, 1979, released them from any indebtedness owed to Peoples Bank.

The release in question referred to a mortgage, dated April 20, 1979, which secured a debt of $677,742.01. The collateral described was farm land which was different from any land described in the two mortgages which are the subject of this action.

Russ Blom, an attorney for Peoples Bank, testified he executed the release because it was later discovered the land described was not owned by the Lalas individually. The intention thereby was to release the collateral, not the underlying debt. The release, however, is couched in much broader terms. It provides that the debt secured by the mortgage "is paid off, satisfied and discharged, and the premises described in said Mortgage are hereby released from the lien thereof."

It is the Lalas' position that the terms of the release conclusively released the underlying debt. Since the debt represented the entire amount owed to Peoples Bank, the mortgages which are the subject of this action secure debt which no longer exists. Thus, it is claimed judgment foreclosure should not have been allowed.

In construing the meaning of the release, we resort to general contract principles. The cardinal principle is that intent of the parties must control, Iowa R.App.P. 14(f)(14). Except in cases of ambiguity, intent is determined by what the contract itself says. Iowa R.App.P. 14(f)(14).

In the instant case, we agree with the Lalas' claim the release appears clear on its face. However, a latent ambiguity arises in light of known facts. Although the release indicates the debt was paid, such was not the case. Due to this ambiguity, it is proper to resort to extrinsic evidence to ascertain the intent of the parties. *See* 17A C.J.S. *Contracts* § 294.

Contrary to the Lalas' assertion, we find that a failure to look to extrinsic evidence in the case would work a gross injustice:

> The purpose of interpretation as justice requires is always the discovery of actual intention:—the intentions of both parties if they are the same,—the actual intention of one party if the other knew or had reason to know what it was,—*but*

*absolutely never to give effect to the meaning of words that neither party in fact gave them,* however many other people might have given them that meaning. *Community S.D. of Postville v. Gordon N. Petersen, Inc.,* 176 N.W.2d 169, 172 (Iowa 1970) (emphasis added).

In looking to extrinsic evidence it is apparent the intention of the bank was to release the collateral not the debt. Accordingly, we affirm the trial court's conclusion in this regard.

While it does not affect our decision, we note that the trial court should have placed the burden of proof upon Peoples Bank. A release is considered prima facie evidence of extinguishment of the debt. *Watkins v. Watkins,* 239 Iowa 325, 329, 31 N.W.2d 354, 356 (1948). The party challenging this principle has the burden of showing that this was not what was intended. *Id.* In the instant case, the court improperly required the Lalas to show that the debt was not extinguished. Even so, we find the evidence in the record rebutted the presumption the debt was extinguished.

## IV.

The Lalas allege there was lack of consideration for the mortgages in question. We cannot agree with this claim. While no new consideration was given, the mortgages secured an antecedent or preexisting debt. This is sufficient consideration under Iowa law. *Padzensky v. Kinzenbaw,* 343 N.W.2d 467, 471 (Iowa 1984); *Charlson v. Farmers State Bank,* 201 Iowa 120, 125, 206 N.W. 812, 814 (1926).

## V.

The Lalas allege Leo did not have sufficient mental capacity at the time the note and mortgage on their family residence were signed. We find that the record does not support that claim.

At the time the mortgages in question were executed, Leo was hospitalized for chest pains and ultimately determined to have an orthopedic cause. Peoples Bank was represented in the transaction by an employee, Don Ellis, whose 20–year relationship with the Lalas was in part social.

A contract cannot be set aside on the ground of incompetency unless evidence demonstrates the person lacked sufficient mental capacity to understand the contract. *In re Guardianship of Collins,* 327 N.W.2d 230, 233 (Iowa 1982). We conclude that this standard has not been satisfied.

At trial, two doctors testified about Leo's mental capacity. Dr. Earl Bickel, an orthopedic surgeon, treated Leo beginning April 13, 1979. He testified Leo was taking valium at the time he signed the mortgages. However, Dr. Bickel spoke only in generalities concerning the effects of the medication and stated that they would vary depending upon the person. There is no evidence that the valium affected Leo's mental capacity to the extent he did not understand the nature of the instrument he was signing. In fact, Dr. Bickel stated that while Leo Lala was in the hospital he made business calls on several occasions and was capable of carrying on conversations. On the very date that one of the challenged mortgages was executed, telephone records indicate that Leo made four long distance calls, all to business connections.

The Lalas also rely on the testimony of Dr. William Moershel, a psychiatrist, to support the claim of lack of mental capacity. Dr. Moershel testified that Leo was mentally impaired at the time he was hospitalized. This opinion was based on the fact that Leo was depressed at the time and suffering from stress of back pain, fears that he might be dying, sleep deprivation, and medication. We find that these factors, without more, do not amount to mental incapacity.

The Lalas have failed to demonstrate Leo lacked the capacity to execute the mortgages. We find no basis for reversal on this issue.

## VI.

Finally, the Lalas contend the notes and mortgage in question which they signed

are invalid because the execution: (1) resulted from undue influence; (2) was obtained by overreaching by Ellis; and (3) was prompted by Ellis while standing in a confidential relationship with the Lalas.

Under Iowa law, to set aside an instrument on the ground of undue influence requires:

> [T]here must be such persuasion as results in overpowering the will of a person or prevents him from acting intelligently, understandingly and voluntarily—such influence as destroys the free agency of the grantor and substitutes the will of another person for his own.

*Harrison v. City National Bank of Clinton,* 210 F.Supp. 362, 373 (S.D. Iowa 1962). *See Stephenson v. Stephenson,* 247 Iowa 785, 797, 74 N.W.2d 679, 686 (1956); *Menary v. Whitney,* 244 Iowa 759, 772, 56 N.W.2d 70, 77 (1952).

In *Stetzel v. Dickenson,* 174 N.W.2d 438, 443 (Iowa 1970), the court defined undue influence as any "improper or wrongful constraint, machination, or urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not do or would do if left to act freely." Undue influence by a third person renders a transaction voidable at the instance the unknowing party becomes victim to it if the third party had reason to know of the undue influence. *Kennedy v. Thomsen,* 320 N.W.2d 657, 659 (Iowa App.1982) (citing Restatement (second) of Contracts §§ 164 comment e, 177 comment c (1981)). Evidence as to undue influence must be clear and convincing. *Harrison,* 210 F.Supp. at 373.

Where a confidential relationship exists between the parties, however, the burden of proof shifts to the party seeking to uphold the validity of the transaction to establish by clear and convincing evidence the transaction was entered into voluntarily. *Punelli v. Punelli,* 364 N.W.2d 259, 261 (Iowa App.1984). The party seeking to uphold the transaction is required to prove entire good faith on its part and free, voluntary and intelligent action by the other party to the transaction. *First National Bank in Sioux City v. Curran,* 206 N.W.2d 317, 322 (Iowa 1973).

A transaction by which the one having the advantage in the confidential relationship profits at the expense of the other is not at arm's length and therefore equity will regard such transactions to be presumptively invalid, fraudulent and voidable. *Estate of Herm,* 284 N.W.2d 191, 200 (Iowa 1979); *Curran,* 206 N.W.2d at 321.

In *Curran* the court defined confidential relationships:

> [T]he phrases "fiduciary relations" and "confidential relations" are ordinarily used as convertible terms and have reference to any relationship of blood, business, friendship, or association in which the parties repose special trust and confidence in each other and are in a position to have and exercise, or do have an exercise, influence over each other.
>
> \* \* \* \* \* \*
>
> Confidential relationship is a very broad term and is not at all confined to any specific association of the parties to it. In law it has been defined or described as any relation existing between the parties to a transaction wherein one of the parties is duty bound to act with the utmost good faith for the benefit of the other party. In its broadest connotation the phrase embraces those multiform positions in life wherein one comes to rely on and trust another in his important affairs. *A confidential relationship arises whenever a continuous trust is reposed by one person in the skill and integrity of another,* and so it has been said that all the variety of relations in which dominion may be exercised by one person fall within the general term "confidential relation."

*Curran,* 206 N.W.2d at 321–22 (emphasis added). *See Estate of Herm,* 284 N.W.2d at 199.

The gist of the doctrine of confidential relationship, therefore, is *the presence of a dominant influence* under which the act is

presumed to have been done. *Estate of Clark*, 357 N.W.2d 34, 37 (Iowa App.1984). By reason of the trust which has developed, the one who reposes confidence is not on guard; he is exposed and relies on the other. *Curran*, 206 N.W.2d at 322. As such, cases founded on confidential relationships do not require a showing that the confidant actually stood over the other or in fact bent the will of the other to the confidant's wishes. *Id.*

In addition, the Iowa courts have viewed the circumstance of the mental strength of the person dominated as having a direct bearing on the issue of undue influence in a confidential relationship. *Estate of Herm*, 284 N.W.2d at 200; *Curran*, 206 N.W.2d at 322; *Kennedy*, 320 N.W.2d at 659.

In *Curran*, the court also specifically considered whether the testator had received independent advice when she transferred bank deposits in determining whether there was undue influence:

> Although independent advice is not essential to uphold a transfer, the court has held that it is an important consideration. "Independent advice" in this connection means the showing that the donor had the benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect, but who was furthermore so disassociated from the interest of the donee as to be in a position to advise the donor impartially and confidentially as to the consequences to himself and of his proposed benefactor (citations omitted).

> * * * * * *

> *The question is not whether the donor had advice available but whether he received advice.*

*Curran*, 206 N.W.2d at 323 (emphasis added).

In *Estate of Herm* the court voided the inter vivos transfer of a deed and other numerous assets by the testator to her nephew as being the result of undue influence in a confidential relationship. *Estate of Herm*, 284 N.W.2d at 200. There the

court found it significant that while the testator had an attorney *draft* a deed to her homestead there was no evidence she had received any independent advice concerning the *conveyancing* of the deed to her nephew. *Id.*

As a general rule, a confidential relationship does not arise solely from a bank-deposition relationship. *Kurth v. Van Horn*, 380 N.W.2d 693, 696 (Iowa 1986); *Manson State Bank v. Tripp*, 248 N.W.2d 105, 108 (Iowa 1976). In *Kurth*, the court rejected plaintiff's contention that a confidential relationship exists when a depositor becomes a borrower. *Kurth*, 380 N.W.2d at 696. Instead, the court held that because circumstances giving rise to a confidential relationship are so diverse, any such relationship must be evaluated on the facts and circumstances of each individual case. *Id.*

■ In the instant case, we find there was more than merely a bank-depositor relationship between the Lalas and Don Ellis of Peoples Bank. For over 20 years the Lalas had obtained all of their business and personal financing through Ellis. At the same time Ellis and the Lalas were close and trusted personal friends. They did many social things together. Ellis testified he even discussed the Lalas' business investments during social gatherings. There is sufficient evidence that during the past 20 years the Lalas and Ellis had placed special trust and confidence in each other. Therefore, Ellis was in a position to exercise influence over the Lalas and had the duty to act with good faith.

■ Assuming that a confidential relationship existed between Ellis and Leo, Peoples Bank presented clear and convincing evidence that the notes and mortgages Leo signed while hospitalized in 1979, were fair and were not the result of undue influence. Prior to Leo's hospitalization, he and Ellis had discussed Leo's financial situation several times. Leo's attorney, Byron Reilly, was present to protect Leo's interests during some of those discussions with Ellis. Leo understood the consequences when Ellis demanded the guaranties and mortgag-

es. On April 10, 1979, Peoples Bank required Leo, for JaKel, sign a note and mortgage for $273,513.24 to Peoples Bank with the grain elevator facility serving as collateral. As such, Leo was well aware prior to his hospitalization Peoples Bank was demanding additional security for his sizable undersecured loans. The fact Leo was in the hospital when he signed the other notes and mortgages prepared by Peoples Bank did not make his actions any less knowing and voluntary.

 With regard to Donna Lala's signature on the $100,000 note and mortgage on their homestead, however, Peoples Bank did not present clear and convincing evidence to rebut the presumptive invalidity of the transaction or to show the transaction was fair under the circumstances. Peoples Bank did disclose all material facts concerning the four other notes and mortgages Donna signed between April 10–20, 1979. However, on the note and mortgage on Donna's Homestead Peoples Bank did not make Donna fully aware of the material fact that her unencumbered homestead was judgment-proof as regards any loan default action by Peoples Bank against her or Leo.

The fact Peoples Bank failed to disclose information on homestead exemption rights, when combined with the fact Peoples Bank could not reach the homestead without Donna's signature and Donna's confidential relationship with Ellis, separates this transaction from the other mortgages Donna signed and warrants closer examination. The combined facts also suggest Peoples Bank owed Donna a greater duty to disclose on the homestead note and mortgage fact.

In *Wilden Clinic, Inc. v. City of Des Moines,* 229 N.W.2d 286, 293 (Iowa 1975), the court held where a relationship of trust or confidence exists between two parties to a transaction the superior party has a duty to disclose all material facts of which he is aware, or at least those favorable to his own position and adverse to the other. *Id. See Nie v. Galena State Bank,* 387 N.W.2d 373 (Iowa App.1986) (bank liable for failing to disclose to plaintiff seeking investment advice that it had personal financial interest in seeing plaintiff's capital infused into an operation in which it had already invested).

Restatement (Second) of Torts § 551 (1977) provides that the superior party in a confidential or fiduciary relationship may be liable for nondisclosure:

(1) *One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose,* if, *but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.*

(2) *One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,*

(a) *matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and*

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) *facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.* (emphasis added).

*See Wilden Clinic, Inc.,* 229 N.W.2d at 293.

Comment f identifies the kinds of relationships of trust and confidence which are subject to the disclosure requirement of § 551:

> *Other relations of trust and confidence include* those of the executor of an estate and its beneficiary, *a bank and an investing depositor,* and those of physician and patient, attorney and client, priest and parishioner, partners, tenants in common and guardian and ward. Members of the same family normally stand in a fiduciary relation to one another, although it is of course obvious that the fact that two men are brothers does not establish relation of trust and confidence when they have become estranged and have not spoken to one another for many years. *In addition, certain types of contracts, such as those of suretyship or guaranty,* insurance and joint adventure, *are recognized as creating in themselves a confidential relation and hence as requiring the utmost good faith and full and fair disclosure of all material facts.* (emphasis added).

A person under the duty to disclose is required to disclose only those matters he has reason to know will be regarded by the other as important in determining his course of action in the transaction in hand. Restatement (Second) of Torts § 551 comment c. *See Wilden Clinic, Inc.,* 229 N.W.2d at 293 (citing 37 Am.Jur.2d *Fraud and Deceit* § 145 (1968) (nondisclosure must relate to a material matter known to the party which is the party's "legal duty to communicate to the other contracting party, whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge or other attendant circumstances.''))

In the instant case, Donna's homestead rights were a material fact which Peoples Bank had a duty to disclose before the bank sought to have her waive those rights. In Iowa a homestead is exempt from judicial sale for the owner's debts incurred after acquisition of the homestead. Iowa Code § 561.16 (1985). *See In re Williams' Estate,* 216 N.W.2d 568 (Iowa 1974). The legislature recognizes a homestead is precious property and should only be encumbered when the encumbrance meets statutory requirements. *Keokuk State Bank v. Eckley,* 354 N.W.2d 785, 792 (Iowa App.1984); Iowa Code § 561.13 (1985). *See Brown v. Vonnahme,* 343 N.W.2d 445 (Iowa 1984). A customer who seeks financial advice from a trusted bank officer and long-time friend to help her husband's financial situation without jeopardizing the family homestead justifiably expects to speak to either a disinterested party or a party who is actively working on behalf of that customer. The fact the Lala homestead was already a paid asset removes the transaction from that of a typical purchase-money home mortgage situation. Instead, it places a higher duty on the financial advisor to clearly explain the full ramifications of the transaction and how it will affect the mortgagor's equity position.

In the instant case, Peoples Bank and Ellis were not acting to help Donna protect her unencumbered homestead when they asked her to sign the $100,000 note and mortgage. Instead, Peoples Bank was motivated only to cover substantial unsecured loans which were now in default. As such, Peoples Bank had conflicting interests and was not a disinterested party when it gave Donna advice and obtained her signature on the note and mortgage of her homestead. We believe the bank's conflict of interest and Donna's homestead rights should have been fully disclosed. Because these facts were not disclosed Peoples Bank did not produce clear and convincing evidence to rebut the presumptive invalidity and unfairness of the note and mortgage transaction on Donna's homestead.

Peoples Bank and the dissent argues that Donna cannot escape liability for the $100,000 mortgage based on nondisclosure because she was given ample opportunity to read the note and mortgage before she signed it. While it is true both husband and wife must sign the mortgage or a

homestead encumbrance is wholly void,[1] the Iowa courts have held conveyance of homestead is valid where the wife signed deed along with husband without making any effort to ascertain its nature even though she did not allegedly know its contents and where there were no special circumstances excusing her negligence. *See Thayer v. Sherman,* 218 Iowa 451, 255 N.W. 506 (1934). *See Wagner v. Wagner,* 242 Iowa 480, 483–5, 45 N.W.2d 508, 511 (1951).

However, the Iowa courts have held where a spouse's position with regard to a mortgage on a homestead for preexisting indebtedness amounts to that of a mere surety, the bank creditor has the duty of dealing with that spouse in utmost good faith. *Charlson v. Farmers State Bank,* 201 Iowa 120, 124–25, 206 N.W. 812, 816–18 (1926).

In *Charlson,* the court upheld the mortgage of the homestead because there was no evidence the bank procured the wife's signature on the mortgage by any fraud, deceit or bad faith and where circumstances showed strongly that the wife understood she was signing a mortgage as to all the farm property including homestead. *Id.*

The circumstances in the instant case are distinguishable from the facts in *Wagner* and *Charlson.* Prior to the mortgage Donna signed, she had an unencumbered interest in a homestead and the only obligation she had to Peoples Bank was a $17,861.93 personal debt she held jointly with Leo. On April 13, 1979, Leo was hospitalized in intensive care showing apparent symptoms of a myocardial infarction. By April 16, 1979, Donna had allegedly voluntarily given a nonpurchase money mortgage and note on that homestead for $100,000. It appears the mortgage Donna signed was not really directed at merely securing the Lalas' $17,861.93 personal debt. Rather the real purpose of the mortgage on the homestead was an attempt by Peoples Bank to obtain $100,000 additional collateral for Leo's business debts. As such,

Donna's position, as co-signer of the mortgage, appears to have been that of a surety on Leo's other delinquent loans. *Charlson,* supra. Therefore, Peoples Bank, as creditor, owed her utmost good faith.

On our de novo review, we clearly find the evidence fails to show Peoples Bank made Donna fully aware of the material fact that she was terminating her homestead exemption rights by giving the mortgage to Peoples Bank to help her husband. We find the following circumstances to be important considerations:

1. Donna was unaware of how much her husband was indebted to Peoples Bank. Don Ellis testified Donna never came to the bank with Leo when he was transacting business. Ellis also admitted that he did not tell Donna about the existence of personal guarantees which Leo had signed prior to his hospitalization and of a $65,000 JaKel debt at the time she signed the note and mortgage on the homestead.

2. Donna had only a high school diploma and two years of secretarial training. She had been employed for a few years prior to her marriage and for a few years thereafter. Donna occasionally helped Leo's businesses in a secretarial capacity. However, even Ellis testified she was not an active employee. Donna had no knowledge of the financial situation or operation of Leo's businesses.

3. There is conflicting evidence as to when Donna signed the mortgage. Leo was hospitalized on April 13, 1979. The mortgage was dated 1:15 p.m., April 16, 1979, while Leo was still in the hospital. Ellis testified Donna signed the mortgage in Leo's hospital room. However, Donna testified she was not at the hospital until after 1:15 p.m. on the date in question. There is evidence suggesting Donna signed the mortgage earlier in the day at Peoples Bank at a

---

**1.** 1981 amendment to 561.12 provides spouse must sign same or like instrument.

meeting with Ellis and Leo's business partners.

4. The note and mortgage were signed with numerous other papers during a flurry of activity by Peoples Bank from April 16–20, 1979. There is no clear and convincing evidence Ellis fully explained to Donna the full consequences of the note and mortgage on the homestead. Donna testified she believed the various instruments she signed were to ease Leo's financial stress while specifically protecting the family residence from Leo's business debts.

5. When Donna signed the note and mortgage she was relying on Ellis to protect her's and her husband's best interests. Not only had Ellis been her banker for over 20 years, but also he had been a trusted friend. Because of her friendship with Ellis and her husband's apparent serious illness, Donna placed her trust in Ellis' skill and integrity to help Leo out of his financial problems. Because of her husband's physical condition, it is apparent Ellis was a dominant influence and Donna relied on that relationship when she signed the note and mortgage.

6. Donna did not receive independent advice about the legal effects of the note and mortgage before signing. The note and mortgage were drafted by the bank and she did not have the opportunity to consult with Reilly or anyone else before being asked to sign the note and mortgage.

7. At the time Donna signed the note and mortgage, Leo was hospitalized with what was thought to be a serious cardiac illness. As a result, she was under severe emotional and mental stress. Peoples Bank did not wait for Leo to be released from the hospital before the bank demanded Leo and Donna sign the various notes and mortgages. Rather, Peoples Bank stepped up its attempts to get collateral for Leo's undersecured loans at a time when Donna's ability to deal with complex business transactions was likely impaired. Peoples Bank required Donna and Leo to sign approximately $850,000 in mortgages in just four days, April 16, 1979, to April 20, 1979.

8. The note and mortgage on the homestead was not a purchase-money security interest. Donna and Leo owned their homestead unencumbered. As such there was no new consideration for the $100,000 mortgage. Rather, the note and mortgage were executed to secure Leo's preexisting indebtedness to Peoples Bank. Donna received no benefit by signing the mortgage. Instead, although jointly she owed only $17,-861.93 to Peoples Bank, Donna ended up with a $100,000 mortgage in favor of Peoples Bank on a homestead which she had owned free and clear and which was exempt from judicial sale to satisfy a judgment for default Peoples Bank obtained against Donna and Leo. In fact, Peoples Bank was the only one which benefited from the note and mortgage Donna signed on her homestead.

9. The factual situation surrounding the signing and notarizing of the note and mortgage is fuzzy. There is conflicting evidence whether Leo and Donna signed the note and mortgage at the same time and place. Ellis admitted that the documents were not properly notarized at the time they were signed, but rather were notarized later by a bank employee. While this alone does not affect the validity of the document, we do consider it in the overall spectrum.

Viewing the circumstances as a whole, we find Donna was not made aware of the legal effects of the note and mortgage on the homestead when she signed it.[2] Fur-

---

2. During the 1986 General Session the Iowa Legislature enacted a new section to Iowa Code chapter 561 on homesteads regarding waivers of homestead rights. Section 561.22 provides:

ther, we find Peoples Bank had a duty to disclose the full legal effects of the mortgage on the Lala homestead and failed to present clear and convincing evidence to rebut the presumptive invalidity of the note and mortgage Donna signed on her unencumbered homestead. We also find Peoples Bank failed to show the transaction terminating Donna's homestead exemption was like the other mortgages Donna signed or was fair under the circumstances. Therefore, we reverse the trial court's judgment foreclosing on the mortgage and note on the Lalas' homestead. We affirm the trial court on all other issues.

Costs on appeal are taxed one-half to Peoples Bank & Trust Company of Cedar Rapids, Iowa and one-half to Leo A. Lala, Jr.

AFFIRMED IN PART, REVERSED IN PART.

SCHLEGEL, J., concurs.

HAYDEN, J., dissents in part.

HAYDEN, Judge (dissenting in part).

I concur with Divisions I, II, III, IV and V of the majority's opinion, however I respectfully dissent to Division VI.

The majority determines that Donna was not made aware of the legal effects of the note and mortgage on the homestead when she signed it, that the Peoples Bank failed to present clear and convincing evidence to rebut the presumptive invalidity of the note and mortgage signed as the homestead and failed to show the transaction terminating Donna's homestead exemption was fair under the circumstances. I find the facts do not support such a determination.

> If a homestead exemption waiver is contained in a written contract, the contract must contain a statement in substantially the following form, in boldface type of a minimum size of ten points, and be signed and dated by the person waiving the exemption at the time of the execution of the contract: 'I understand that homestead property is in many cases protected from the claims of creditors and exempt from judicial sale; and that by signing this contract, I voluntarily give up my right to this protection for this property with respect to claims based upon this contract.'

The majority determines that Leo was well aware prior to his hospitalization Peoples Bank was demanding additional security for his sizable undersecured loans and the fact Leo was in the hospital when he signed the other notes and mortgages prepared by the Peoples Bank did not make his actions any less knowing and voluntary. The facts show that Donna was present and approved Leo signing the documents in the hospital, and she was given an opportunity to read them.

Donna has had two years of secretarial schooling beyond high school. She was employed as a secretary for a few years. She had assisted her husband in his business as his secretary. She is shown to be competent and of average or above intelligence. I am not persuaded by the argument that Donna was unaware that the documents encumbered her house.

When a party is given an opportunity to read a contract or document, but fails to do so because of statements by an adversary, that party cannot escape liability under the theory that she was ignorant of the terms of the document. *Preston v. Howell*, 219 Iowa 230, 236, 257 N.W. 415, 418 (1934), *Wilmotte & Co. v. Rosenman Bros., Inc.* 258 NW 2d 317, 323 (Iowa 1977), *Weitz Co., Inc. v. Mo-Kan Carpet, Inc.*, 723 F.2d 1382, 1385 (8th Cir. 1983); *see also Schlosser v. Van Dusseldorp*, 251 Iowa 521, 527, 101 N.W.2d 715, 719 (1960) (ignorance of the contents of an instrument does not ordinarily affect the liability of who signs it).

I would affirm the trial court in all respects.

> Section 561.22, which became effective May 30, 1986, further strengthens the longstanding special recognition which the legislature has given to homesteads. Section 561.22 was not in place at the time the trial court entered judgment against the Lalas. However, § 561.22 reflects the same concern we have that mortgages must make mortgagors fully aware of the legal effects of a note and mortgage on ordinarily exempt homesteads.