ENVIROGAS, L.P., Appellee,

v.

**CEDAR RAPIDS/LINN COUNTY SOLID WASTE AGENCY d/b/a Bluestem Solid Waste Agency, Appellant.**

No. 99–1672.

Supreme Court of Iowa.

April 3, 2002.

David F. McGuire and James H. Flitz, Cedar Rapids, for appellant.

Donald G. Thompson and Ellen Ramsey-Kacena of Bradley & Riley, P.C., Cedar Rapids, for appellee.

TERNUS, Justice.

The primary issue we decide in this case is whether appellant, Bluestem Solid Waste Agency, an entity created under Iowa Code chapter 28E (1995), must comply with the competitive bidding requirements of Iowa Code chapter 384. The trial court ruled that Bluestem was subject to the public bidding law and that its failure to comply with that law rendered an agreement between Bluestem and appellee, EnviroGas, L.P., unenforceable. Although the court denied any contractual recovery to EnviroGas, the court awarded damages to EnviroGas under a theory of fraud based on representations made by the executive director of Bluestem.

Upon our review, we conclude the trial court erred in holding that the competitive bidding law applied to the agreement between Bluestem and EnviroGas. Accordingly, we hold that EnviroGas was entitled to recover under the contract and affirm the award of damages on that basis. *See In re Estate of Voss*, 553 N.W.2d 878, 879 n. 1 (Iowa 1996) (holding appellate court may affirm "on any basis appearing in the record and urged by the prevailing party"). This ruling makes it unnecessary to consider EnviroGas's fraud claim.

Bluestem also claims error in the assessment of costs. EnviroGas concedes that certain deposition expenses were improperly taxed as costs. We reverse that part of the trial court's judgment awarding these expenses and remand for entry of a judgment consistent with our decision.

I. *Background Facts and Proceedings.*

In 1994 Linn County and the City of Cedar Rapids entered into a 28E agreement, creating Bluestem Solid Waste Agency to operate two landfills in Linn County. *See* Iowa Code ch. 28E (allowing local governments to exercise their powers jointly through a separate legal entity formed pursuant to the provisions of this chapter). Bluestem is administered by a board of directors; daily operations are the responsibility of Bluestem's executive director, David Hogan.

EnviroGas, L.P. is a limited partnership that owns the right to operate a system in place at one of the landfills that collects methane gas generated by the waste at the landfill. It sells the gas to utilities that use the gas to produce power.

In the early 1990s Bluestem was under a state mandate to install a system at the landfills to collect leachate, a liquid by-product of the waste materials deposited at the site. By coincidence, EnviroGas began planning in mid–1995 to expand its gas collection system. Hogan suggested that EnviroGas and Bluestem cooperate to build a combined gas and leachate collection system, resulting in significant cost savings to both parties.

Bluestem's finance committee approved the concept of a combined system and recommended a $400,000 contribution to construction of the project. It was asserted at trial that this recommendation included a limitation on the use of the $400,000 to materials, engineering services and equipment, based on a concern that payment of labor costs would require public bidding of the job. In addition, the finance committee, or at least its chairman, indicated that Bluestem would contribute no more than $400,000. Hogan sent a letter to EnviroGas, indicating Bluestem's willingness to participate in the project on a proportionate basis. This letter did not reveal any limitations on the use of funds paid by Bluestem, nor did it state that

Bluestem would not pay more than its initial $400,000 contribution.

EnviroGas built the combined system, completing it in July 1996. It then sought to collect the balance owed by Bluestem. Bluestem refused to pay its proportionate share and this lawsuit followed.

EnviroGas sought to recover under several theories, including breach of contract, restitution, fraud, promissory estoppel, and quantum meruit. Bluestem's primary defense was that the project should have been publicly bid. Because it was not, argued Bluestem, it was prohibited by law from expending funds on the project, thereby rendering the contract void and precluding any recovery by EnviroGas. In a pre-trial motion to adjudicate law points and again at trial, the district court held that the competitive bidding law applied. Accordingly, the trial court ruled that EnviroGas could not recover under its contract, promissory estoppel, and quantum meruit claims. (The court did not address the restitution claim.) Nonetheless, the trial court awarded damages to EnviroGas based on a theory of fraudulent misrepresentation. Bluestem filed this appeal.

## II. *Issues Raised on Appeal.*

Bluestem challenges the court's ruling on EnviroGas's fraud claim, asserting that to allow a tort recovery for public improvements that were not subjected to competitive bidding would defeat the purpose of the competitive bidding statute. Alternatively, Bluestem argues that the necessary elements of fraudulent misrepresentation were not supported by substantial evidence. Bluestem also attacks the trial court's calculation of damages and its taxation as costs of depositions that were not introduced into evidence.

EnviroGas contends that the judgment should be affirmed because it was entitled to recover under its contract claim or one of the equitable theories alleged in its petition. It also asserts that judgment was correctly rendered on its claim of fraud and that the court's calculation of damages is supported by substantial evidence. As for Bluestem's challenge to the taxation of costs, EnviroGas concedes that the costs of two depositions, those of William J. Kinney and Jeffrey Schott, should not have been included in the judgment. On the other hand, EnviroGas claims that the cost of the deposition of the mayor of Cedar Rapids, Lee Clancy, was properly recoverable.

In response to EnviroGas's claim that the judgment should be affirmed on the basis of its contract claim, Bluestem argues that EnviroGas was required to file a cross-appeal to preserve that issue for review. Alternatively, Bluestem asserts (1) the contract was void because the parties did not comply with the competitive bidding law, and (2) the elements of a contract were not established.

As noted earlier, we find EnviroGas's contract claim to be dispositive of Bluestem's challenge to the trial court's finding of liability on the part of Bluestem, so we will discuss only the issues pertinent to that theory of liability. In addition, we will address Bluestem's claimed error in the award of damages and the assessment of costs made by the trial court.

## III. *Standard of Review on Contract Claim.*

Where a breach-of-contract claim is tried as a law action, our review is for correction of errors of law. *See Land O'Lakes, Inc. v. Hanig,* 610 N.W.2d 518, 522 (Iowa 2000). To the extent the validity of the contract turns on an interpretation of chapter 384, we also review for correction of legal error. *See Top of Iowa Coop. v. Sime Farms, Inc.,* 608 N.W.2d 454, 460 (Iowa 2000).

The trial court's "legal conclusions and application of legal principles are not binding on the appellate court." *See Land O'Lakes*, 610 N.W.2d at 522. In contrast, any findings of fact made by the trial court are binding on appeal if supported by substantial evidence. *See Van Oort Constr. Co. v. Nuckoll's Concrete Serv., Inc.*, 599 N.W.2d 684, 689 (Iowa 1999). " 'Evidence is substantial for purposes of sustaining a finding of fact when a reasonable mind would accept it as adequate to reach a conclusion.' " *Land O'Lakes*, 610 N.W.2d at 522 (quoting *Falczynski v. Amoco Oil Co.*, 533 N.W.2d 226, 230 (Iowa 1995)). The evidence is viewed "in a light most favorable to the trial court's judgment." *Van Oort Constr.*, 599 N.W.2d at 689.

### IV. Correctness of Ruling on Contract Claim.

As indicated in our recitation of the facts, the trial court denied recovery under a theory of breach of contract on the basis that the public bidding law should have been followed and was not. *See Kunkle Water & Elec., Inc. v. City of Prescott*, 347 N.W.2d 648, 656 (Iowa 1984) (noting that contracts let without required public bidding are "void, not merely voidable"). The first step in our analysis, therefore, is to decide whether the court's determination that the competitive bidding statute applied is correct. Before we consider this issue, however, we address Bluestem's concern that error was not preserved.

A. *Error preservation.* The district court's initial consideration of the competitive bidding law was in its ruling on Bluestem's motion to adjudicate law points. In that ruling, the court held that the public bidding requirements of division VI of Iowa Code chapter 384 applied *if* the cost thresholds established by statute were met. *See* Iowa Code §§ 331.341(1) (re-

quiring county to submit project for public bidding where cost to county exceeds amount specified in section 309.40 ($50,-000)), 384.96 (requiring city to submit project for public bidding where cost to city exceeds $25,000). The court observed whether these cost thresholds were satisfied was a factual issue that would be determined at trial. In its ruling after trial, the court again addressed the public bidding requirements. Referring to its earlier ruling, the court summarily stated that the competitive bidding law applied to the project undertaken by Bluestem and EnviroGas. It held, therefore, that EnviroGas was precluded from recovering under its contract with Bluestem. Nonetheless, EnviroGas was ultimately successful at trial, obtaining a judgment of damages on its fraud claim.

Ordinarily, "a successful party need not cross-appeal to preserve error on a ground urged but ignored or rejected" by the trial court. *Johnston Equip. Corp. v. Indus. Indem.*, 489 N.W.2d 13, 16 (Iowa 1992). Bluestem contends, however, that this principle should not be applied where the trial court ruled on the contested issue in response to a motion to adjudicate law points. *See generally* Iowa R. Civ. P. 1.454 (providing a mechanism for the pretrial adjudication of legal issues) (formerly Iowa Rule of Civil Procedure 116). This contention rests on the provision in rule 1.454 that states an adjudication of a point of law "shall not be questioned on the trial of any part of the case of which it does not dispose." Iowa R. Civ. P. 1.454.

We reject Bluestem's argument that the nature of an adjudication of law points dictates that such a ruling be considered sacrosanct even on appeal unless the party on the losing side of such a ruling files a notice of appeal. In our view, there is no logical nexus between the principle that a rule 1.454 ruling cannot be questioned *at*

*trial* and the ability of the ultimately-successful party to challenge such a ruling *on appeal* like any other adverse district court ruling. We further note that a motion-to-adjudicate-law-points ruling is not as unalterable as Bluestem suggests. Despite the language of rule 1.454, we have condoned a district court's correction of its own prior ruling on a motion to adjudicate law points. *See Woods v. Schmitt,* 439 N.W.2d 855, 865–66 (Iowa 1989). For all these reasons, we hold that EnviroGas's failure to file a cross-appeal does not preclude this court from reviewing the trial court's decision on the applicability of the competitive bidding law.

B. *Applicability of the competitive bidding statute.* EnviroGas raises a two-fold challenge to the trial court's ruling that the public bidding law applied here: (1) division VI of chapter 384 does not apply to 28E entities; and (2) even if the statute governs projects by 28E entities, the project at issue here did not meet the threshold expenditure requirements so as to trigger the necessity of public bidding. Although the court did not specifically discuss the latter issue, we presume this factual matter was resolved so as to support the court's ultimate ruling. *See Bankers Trust Co. v. Fidata Trust Co.,* 452 N.W.2d 411, 413 (Iowa 1990) (stating that the reviewing court will presume the trial court decided the facts necessary to support its decision); *Brichacek v. Hiskey,* 401 N.W.2d 44, 46 (Iowa 1987) ("When no motion to enlarge or amend was made, we assume as fact an unstated finding that is necessary to support the judgment.").

■ 1. *Applicability of chapter 384 to 28E entities.* Although the focus of this appeal is on the application of division VI of chapter 384 to 28E entities, it is helpful to our consideration of the scope of division VI to first review a companion part of the statute—division IV. *See generally State v. Casey's Gen. Stores, Inc.,* 587 N.W.2d 599, 601 (Iowa 1998) (stating that the court construes "statutes that relate to the same or a closely allied subject together so as to produce a harmonious and consistent body of legislation"); *In re B.B.,* 516 N.W.2d 874, 878 (Iowa 1994) ("We do not consider one portion of a statute in isolation, but rather construe it in context with other portions of the statute."). In division IV of chapter 384, the legislature addresses the financing of a "public improvement" through special assessments on private property. *See* Iowa Code §§ 384.37–.79 (designated as division IV of chapter 384). This division requires public bidding under various circumstances, including a city undertaking a public improvement *pursuant to an agreement under chapter 28E. See id.* § 384.76. The term "public improvement" is defined for purposes of division IV to include certain designated projects such as sewers, streets and sidewalks. *See id.* § 384.37(19).

It is apparent from a review of these statutory provisions that division IV does not apply here. First, a collection system such as that constructed by EnviroGas is not within the list of improvements set forth in division IV's definition of "public improvement." In addition, the financing of the collection system at issue here did not involve special assessments on private property. Therefore, as all parties concede, the competitive bidding requirements of division IV of chapter 384 do not apply to Bluestem, the 28E entity involved in the present dispute.

We turn now to a consideration of the other potentially applicable competitive bidding statutes: division VI of chapter 384, governing contract letting procedures for "public improvements" by a city, and chapter 331, governing county contracts for "public improvements." Our discussion will focus on division VI of chapter

384 since chapter 331 has no independent requirements for public bidding but merely makes the contract letting procedures imposed on cities applicable to counties. *See id.* § 331.341(1).

At the outset, it is important to note that the legislature did not include a provision in division VI similar to section 384.76 that requires a city or county undertaking a public improvement through a 28E entity to comply with the competitive bidding laws. In the absence of such a provision, we cannot agree with Bluestem's argument that the legislature intended to subject 28E entities to the competitive bidding requirements of division VI just as though a city or county had undertaken the public improvement. There is simply no basis for this court to expand the scope of division VI to encompass 28E entities, particularly where it is apparent that the legislature knew how to include 28E entities, as it did in section 384.76, had it wanted to do so. *See Casey's Gen. Stores, Inc.,* 587 N.W.2d at 602–03 (refusing to interpret criminal statute to impose vicarious liability where there was no expression of legislative intent to do so, particularly where legislature had expressly imposed vicarious liability for violation of same statute in civil context); *see also Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Shell Oil Co.,* 606 N.W.2d 376, 379 (Iowa 2000) ("We determine [legislative] intent from what the legislature said, not from what it might or should have said."); *Moulton v. Iowa Employment Sec. Comm'n,* 239 Iowa 1161, 1172, 34 N.W.2d 211, 216 (1948) (" 'The court is not at liberty to read into the statute provisions which the legislature did not see fit to incorporate, nor may it enlarge the scope of its provisions by an unwarranted interpretation of the language used.' " (Citation omitted.)). We hold, therefore, that division VI of chapter 384 and chapter 331 do not apply directly to 28E entities.

Contrary to Bluestem's position, this conclusion does not thwart the underlying purpose of competitive bidding statutes, which is to benefit the public as taxpayers. *See Elview Constr. Co. v. N. Scott Cmty. Sch. Dist.,* 373 N.W.2d 138, 141 (Iowa 1985) (holding that competitive bidding laws were enacted to protect the public and were "for the benefit of the taxpayers"). The legislature ensured that division VI of chapter 384 and chapter 331 would achieve this goal by the way it defined the term "public improvement" for purposes of these statutes. Unlike the limited definition of "public improvement" adopted by the legislature in division IV, *see* Iowa Code § 384.37(19), which encompasses only certain types of projects, the definition of "public improvement" for purposes of city and county contracts is much broader, *see id.* § 384.95. The latter definition encompasses "*any* building or construction work ... *to be paid for in whole or in part by the use of funds of the city [or county]." Id.* (emphasis added); *accord id.* § 331.341(1) (stating that "public improvement" as used in statute governing county contracts "means the same as defined in section 384.95" substituting the word "county" for the word "city"). Thus, under this definition, the determinative factor is the use of city or county funds, not the identity of the contracting party. In this way, the legislature has provided for the protection of taxpayers. It is not this court's role to decide whether it would be better policy to simply apply competitive bidding statutes to 28E entities in general. *See State v. Johnson,* 630 N.W.2d 583, 586 (Iowa 2001) ("[T]he court will not 'substitute its judgment for that of the legislature on matters of policy.' " (Citation omitted.)).

We also reject Bluestem's argument that our decision is at odds with Iowa Code section 28E.7, which provides that a city or county is not relieved "of any obligation or responsibility imposed upon it by law" by entering into a 28E agreement. Iowa Code § 28E.7. As we have pointed out, a city or county must comply with the public bidding laws *only* when the project at issue requires expenditures of *city* or *county* funds meeting or exceeding the statutory thresholds. This obligation remains intact under our interpretation of chapter 384: if the combined collection system requires the statutory level of monetary payments from the city or county, competitive bidding is required, even though the contracting party is a 28E entity rather than the city or county. We simply refuse to rewrite chapter 384 so as to trigger the competitive bidding requirements when the project is financed, not by *city* or *county* funds, but by the funds of a separate legal entity not encompassed within the terms of division VI of chapter 384.

■■ 2. *Use of county or city funds.* Having concluded that the statutory language does not permit wholesale application of the public bidding laws contained in division VI to 28E entities, the focus must be on whether the project at issue here is "to be paid for in whole or in part by the use of funds of the city [or county]." *See id.* §§ 331.341(1), 384.95. Moreover, Bluestem was required to prove that any such expenditure of city or county funds reached the statutorily required threshold of $25,000 for the city and $50,000 for the county. *See Watkins v. Watkins,* 239 Iowa 325, 330, 31 N.W.2d 354, 356 (1948) (holding that burden to prove agreement was void and unenforceable because it violated a federal statute was on the defendant). *See generally* Iowa Code §§ 331.341(1), 384.96 (providing that public bidding is not required until certain minimum levels of expenditures are made).

As we noted earlier, although the trial court did not expressly make a factual finding as to these matters, we will presume the court found the facts necessary to support its decision that the project was subject to competitive bidding requirements. The question, then, is whether there is substantial evidence in the record to support a finding that the collection system was to be paid in whole or in part by city and/or county funds meeting or exceeding the statutory thresholds.

It is undisputed in the record that neither the city nor the county had an obligation to directly pay for this project. Rather, the agreement required Bluestem, a separate legal entity, to contribute to the cost of the system. The only evidence that Bluestem used county or city funds for this obligation focused on the original funding for Bluestem in early 1994. At that time, the city contributed $450,000 and the county contributed $50,000 to finance the start-up of the newly formed 28E entity and the two landfills it operated. But there is no evidence, let alone substantial evidence, to support a finding that these start-up funds were available to pay for the collection system installed by EnviroGas two years later.

According to Bluestem's own director, David Hogan, the initial contributions made by the city and county were used as "seed money" to get the enterprise started and to fund the operation of the landfills until Bluestem collected sufficient fees from users to finance its ongoing operations. In addition, an unspecified portion of these start-up funds were deposited into a special "liability account" that was primarily intended to cover the costs incurred in closing the landfills at some point in the future. The liability or closure account also contained user fees, which, according

to Hogan, were "routinely" deposited into this account. Hogan testified that an unidentified portion of the expenses Bluestem incurred in the project at issue here was paid from this special account.

Importantly, Hogan testified that he could not track the seed money contributed by the city and county, but he believed that "probably it's been used." Hogan testified that after Bluestem "used that money up," it operated with money or fees collected from persons using the landfills. Hogan's testimony that the seed money had already been spent was supported by the fact that Bluestem had an annual budget in 1994 of $6 million dollars, which grew to almost $8 million by 1999. Common sense supports the inference that by 1996, when the collection system was built, the $500,000 seed money would have been gone.

In summary, we think it would be pure speculation to conclude from the evidence in this case that *any* city or county funds were used or were to be used to pay for the collection system built by EnviroGas, let alone that such funds reached the cost thresholds of $25,000 and $50,000 respectively. We hold, therefore, that there is not substantial evidence to support a finding that this project falls within the legislature's definition of "public improvement" or that any city or county expenditures met or exceeded the statutory thresholds. Accordingly, the trial court erred in concluding that the competitive bidding statutes applied. It follows that the court also erred in ruling that the contract between Bluestem and EnviroGas was unenforceable.

■ C. *Elements of contract claim.* Bluestem contends that even if the parties' agreement for construction of a combined collection system is not unenforceable, the elements of a contract were not established at trial. The only specific flaw argued by Bluestem, however, relates to whether the parties agreed on how the costs of the combined system were to be divided. Therefore, we confine our discussion to this issue. *See Soo Line R.R. v. Iowa Dep't of Transp.*, 521 N.W.2d 685, 689 (Iowa 1994) (stating random mention of issue, without elaboration or supporting authority, is insufficient to raise issue for appellate court's consideration); *accord State v. Mann*, 602 N.W.2d 785, 788 n. 1 (Iowa 1999).

Although the trial court did not expressly address whether the elements of a contract claim were proved, it necessarily determined the financial terms of the contract because it applied a benefit-of-the-bargain measure of damages in allowing a recovery under the fraud theory. In assessing the damages resulting from Bluestem's fraud, the trial court awarded the amount of money that EnviroGas had not been reimbursed under its agreement with Bluestem. Bluestem contends there was not substantial evidence to support the district court's calculation of damages.

■ At trial there was conflicting testimony on how the parties had agreed to share the cost of the combined system built by EnviroGas. In addition, both parties introduced expert testimony on the incremental cost of the leachate system and Bluestem's share of the total cost of the combined system. The trial court specifically found the testimony of EnviroGas's expert to be more convincing. Because we review only for the correction of errors at law, we will not reweigh the evidence nor assess the credibility of the witnesses. *See In re Estate of Todd*, 585 N.W.2d 273, 278 (Iowa 1998) (holding in action tried at law, that court was "in no position to weigh the evidence"); *Tim O'Neill Chevrolet, Inc. v. Forristall*, 551 N.W.2d 611, 614 (Iowa 1996) ("Our task is not to weigh the evidence or the credibility

of the witnesses."). We think the testimony offered by EnviroGas's witnesses and expert constitutes substantial evidence that supports the trial court's determination of how the cost of the system was to be shared and what portion of that cost Bluestem owed. Therefore, we find no error on this issue.

Our decision that the trial court's award of damages is sustainable under EnviroGas's contract theory makes it unnecessary for us to address EnviroGas's fraud claim. We turn now to the claimed error in the taxation of costs.

### V.   Costs.

■ Bluestem challenges the district court's assessment of the expense of three depositions as costs. EnviroGas concedes that two depositions should not have been included in the award of costs, but claims that the third deposition, that of Mayor Lee Clancy, was properly taxed as a cost.

■ Iowa Rule of Civil Procedure 1.716 controls. This rule provides:

Costs of taking and proceeding to procure a deposition shall be paid by the party taking it who cannot use it in evidence until such costs are paid. *The judgment shall award against the losing party only such portion of these costs as were necessarily incurred for testimony offered and admitted upon the trial.*

Iowa R. Civ. P. 1.716 (formerly Iowa Rule of Civil Procedure 157) (emphasis added). Costs for depositions are not "necessarily incurred" within the meaning of this rule unless they are "introduced into evidence in whole or in part at trial." *Woody v. Machin*, 380 N.W.2d 727, 730 (Iowa 1986). Once the threshold requirement that the deposition be introduced into evidence is met, the trial court has discretion to tax the deposition expense as a cost. *Id.* As we noted in *Woody*, a trial court may

choose not to allow the expense or may choose to award only a portion of the cost. *Id.* For example, the court "might find the offer of deposition testimony was not made for a useful purpose ... [o]r ... that only a part of the costs met the necessity standard." *Id.* In such instances, the trial court could conclude that some or all of the costs were not "necessarily incurred."

As this discussion reveals, the trial court's decision-making process is twofold. The trial court must initially make a factual finding that the prerequisite for allowance of the deposition expense is met, i.e., that the deposition was "introduced into evidence in whole or in part at trial." *Id.* The court then must exercise its discretion in deciding whether all or some portion of the cost was "necessarily incurred." *See id.* (noting that the court's determination under rule 157(a) (now rule 1.716) "involves an exercise of discretion").

■ This two-stage analytical framework triggers a two-tiered standard of review. *See Sec. State Bank v. Ziegeldorf,* 554 N.W.2d 884, 893 (Iowa 1996) (adopting two standards of review where court was required to make a factual finding as to statutory prerequisite for allowance of attorney fees and then exercise discretion as to amount of fees to allow). As to the first step in the trial court's analysis, we review the record to determine whether there is substantial evidence to support the trial court's finding that the threshold requirement of admission at trial was met. *See Sec. State Bank,* 554 N.W.2d at 893 (reviewing factual finding that statutory prerequisite for allowance of attorney fees was met for substantial evidence). We review the court's subsequent determination of necessity for an abuse of discretion. *See Woody,* 380 N.W.2d at 730 (stating that court will "reverse a finding on the necessity issue only for abuse of discretion"). We now address the specific

challenge made by Bluestem to the court's taxation of the Clancy deposition expense.

Bluestem claims that the Clancy deposition was not "admitted nor introduced as evidence at the trial." This alleged error requires our court to review the record to determine whether there is substantial evidence to support the trial court's implicit finding that this factual prerequisite was met. Our review of the trial transcript reveals that, during the presentation of evidence, the attorney for EnviroGas began to read into the record portions of Clancy's deposition. The court questioned whether there was "any reason why we couldn't provide [the deposition] to the record" rather than being read into evidence. At that point, the attorney ceased his reading of the deposition. Although the transcript shows no formal offer of the deposition into evidence, the court reporter's list of exhibits includes the Clancy deposition.

We think the record contains substantial evidence to support a finding that the threshold requirement for taxing the deposition expense as a cost was met. Consequently, the trial court was permitted, in its discretion, to include some or all of this expense in the judgment. Because Bluestem has not challenged the trial court's exercise of discretion, we find no basis to reverse the taxation of the cost of the Clancy deposition.

## VI. *Summary and Disposition.*

We hold that the trial court erred in ruling that Bluestem was required to comply with the public bidding statute before it could contribute its funds to the construction of a combined collection system. Consequently, the court also erred in holding that the agreement between the parties requiring Bluestem to pay a proportionate share of the cost of the system was unenforceable. We hold, therefore, the trial court should have awarded damages to EnviroGas under its contract theory. We need not remand for a determination of damages, however, because the trial court's measure of damages under the fraud theory was identical to the damages recoverable under EnviroGas's contract claim. Finding substantial evidence to support the trial court's determination of the amount owed by Bluestem under the contract, we affirm the court's judgment of liability and damages.

As for that part of the judgment taxing costs, we reverse the assessment of costs for the Kinney and Schott depositions. We affirm the trial court's taxation of the expense of the Clancy deposition. We remand for entry of judgment in accordance with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED WITH DIRECTIONS.**

All justices concur except STREIT, J., who concurs specially, LARSON, J., who joins this special concurrence, and CARTER, J., who dissents.

STREIT, Justice (concurring specially).

While I concur with the majority's conclusion that EnviroGas is entitled to recover damages from Bluestem, I concur specially because I am convinced the competitive bidding requirements of Division VI applied to this project. Specifically, I believe, at a minimum, $101,000 of public funds were used to drill the wells necessary for the construction of the methane/leachate collection system. Because there was substantial evidence to conclude public funds and equipment were used in the construction of this joint project, I would affirm the trial court's determination of this issue.

We cannot permit entities engaged in the construction of public improvements to evade the public bidding requirements

simply by forming a 28E corporation. The district court correctly found strong policy reasons exist at the heart of competitive bidding statutes that impose the exact type of obligation on a city or county which cannot be avoided by the "expedient of creating a separate legal entity pursuant to a chapter 28E agreement." The legislature did not intend the only public improvements subject to competitive bidding, where the project contracted with an entity established pursuant to chapter 28E, are those public improvements defined by Division IV of chapter 384. Iowa Code § 384.37(19).

The majority says it refuses to expand the scope of Division VI by finding 28E entities are subject to the competitive bidding requirement in Division VI. I would say this differently—we refuse to limit the scope of Division VI of chapter 384; that the public bidding laws apply to projects where funding from public sources exceed the statutory minimums, even if a 28E entity is developing the project. We must apply the statute as written. It would be unreasonable to conclude a city or county may circumvent the more general competitive bidding requirements of Division VI by forming a 28E entity. Therefore where, as here, public funds are used to finance a public improvements project, the competitive bidding requirements in Division VI are triggered if the city and county contribute minimum funds. The focus then is on whether public funds were used in this project.

I disagree with the majority's depiction of the money used to construct the joint system. The majority is content to conclude that when public money—here,

$500,000 of public money—is transferred to a 28E entity, the money somehow loses its public character. This is the essence of their holding. The mere fact that a 28E entity is using public money to construct a public improvement does not mean the money ceases to be public funds.

The majority finds the $500,000 of public funds somehow vanished or became less public when it was placed into the hands of this 28E entity. In so concluding, the majority opinion hinges much on Hogan's testimony that the city and county funds were "probably used up." By vesting such significance in this one phrase, the majority ignores substantial other evidence. The same witness who testified the public funds were "probably used up" also testified how these funds were used.

Hogan's testimony explained what he meant by saying the public funds were "used up." The city and county "contributed all plant and capital, in other words all the equipment and the two landfills ..." including the real estate for both landfills.[1] He further explained the city and county funds were used to purchase "all of the heavy equipment that is used on both sites, ... virtually everything in the equipment, parts and inventory." Two years after the investment of public funds of $500,000, this infrastructure of land and equipment was used to build the methane/leachate system.[2]

Hogan also stated the user fees and the city and county funds all go into the same Bluestem account. As to the operating expenses, Hogan testified the money comes out of "day-to-day operations, funds." This money includes "a contribution from both the city and the county, and

1. Hogan's testimony at trial implied the equipment purchased by funds from the city and county is presently being used at the Bluestem landfills and was used to construct the joint methane/leachate collection system.

2. Three years later, at trial, the land and equipment had a value between one and one and a half million dollars.

then in addition to that there are funds deposited to our account based on fees that we charge the public."

Most importantly, Bluestem put part of the $500,000 into a closure account shortly after the city and county made their respective contributions in 1994. The closure account was to be used to close the landfill when it was full. These funds are also to be used to monitor the landfill for thirty years following closure. Hogan stated a portion of these public funds "was used also for the drilling of the wells." As an initial step in the construction of the system, it was necessary to drill wells at the site of the landfill. When asked about the financing for the well-drilling portion of the methane/leachate project, Hogan stated "it was paid for with public funds...." The entire expense for construction and labor of the well-drilling, all from the closure account, was over $101,000. This contribution of public funds alone is well over the statutory minimums necessary to trigger the competitive bidding requirement in Division VI.

Finally, Hogan was asked if the city and county made any additional contributions, to which he responded:

> They each have a liability to the agency that relates to the amount of fill that had already been placed until we took over, but that's a liability that they will satisfy when we actually close. So there are other contributions, but it's now existing in the form of a liability on their books.

Though the majority relies on Hogan's statement that Bluestem "used that money up," (referring to the public funds) it misconstrues Hogan's statement to conclude he meant the money was not used in the construction of the joint system. To the contrary, the money was integrally involved and is still there. It is in the land upon which Bluestem constructed the landfill and the methane/leachate collection system. It is in the equipment Bluestem used to construct the landfill and the joint system, and continues to use at the site. It is in the wells at the site. And finally, the money is in the closure account. The money has not gone anywhere.

The majority says its conclusion the "seed" money was used up by 1996 is supported by the fact that Bluestem had an annual budget in 1996 of $6 million, which grew to almost $8 million by 1999. Given this fact, the majority concludes no public money could have been used in the construction of the joint system. However, the mere size of the operating budget does not change the fact that the county and city are only required to contribute $50,000 and $25,000 respectively to the construction of the project in order for competitive bidding to apply. Furthermore, the fact that some of the public funds were used before 1996 does not mean those funds were not used in furtherance of the construction of the joint system. The evidence shows at least $101,000 of public funds were used in constructing the joint system. Given the totality of the facts, the inescapable conclusion is that sufficient public funds were used in the creation of the methane/leachate collection system to trigger the competitive bidding requirement.

On appeal, we must determine whether there is substantial evidence in the record to uphold the trial court's conclusions. "Evidence is substantial when a reasonable mind would accept it as adequate to reach a conclusion." *Hasselman v. Hasselman,* 596 N.W.2d 541, 545 (Iowa 1999). Furthermore, if the findings are ambiguous, they will be construed to uphold, not defeat, the judgment. *Byers v. Contemporary Indus. Midwest, Inc.,* 419 N.W.2d 396, 397 (Iowa 1988). While there may be some evidence to the contrary, the sub-

stantial evidence in the record supports the trial court's ruling. Our duty is not to choose between evidence supporting the trial court's ruling and that contrary to it. We are only to decide whether substantial evidence existed upon which the court could conclude public funds were involved. If such substantial evidence exists, we are bound by the trial court's ruling. For the reasons stated above, I would uphold the judgment of the trial court on this issue.

In conclusion, if it walks like a duck, quacks like a duck, and tastes good with plum sauce, that's substantial evidence it's a duck. We have public money used to buy public property, developed with public equipment, and public funds to provide for the landfill clean-up and monitoring for the years to come. At a minimum, substantial evidence supports the conclusion that over $101,000 of public funds were used to finance the well-drilling portion of the methane/leachate project. Given the extensive entanglements[3] of public funds in this case, it is impossible to find the public character of this project has been in any way compromised or destroyed simply because a portion of expenses were paid for with user fees. There is substantial evidence to support the conclusion public funds were used to construct the joint system. Given this determination, I would affirm the trial court's determination on this issue.

LARSON, J., joins this special concurrence.

CARTER, Justice (dissenting).

I dissent.

I share Justice Streit's view that the competitive-bidding laws did apply to Bluestem in contracting for the methane/leachate system. Thus, the majority is wrong in upholding EnviroGas's contract claim.

I disagree with Justice Streit, however, on whether the trial court's judgment based on alleged fraud should be upheld. I submit that it should not be. When public entities choose to violate the competitive-bidding laws, they will almost always give assurances to the noncompetitive bidder that the acceptance of that bid is proper. If such assurances are deemed to constitute actionable fraud on the part of the public entity, then the competitive-bidding law will serve no purpose in protecting the taxpayers.

With respect to the claim that Bluestem's agent knowingly misrepresented his spending authority, that is beside the point. If, as Justice Streit and I contend, any spending on the project would have been in violation of the public-bidding laws, the extent of the agent's spending authority may not be made the basis of an action for fraud.

I would hold that EnviroGas has no claim against Bluestem and reverse the judgment for damages against it.

---

**3.** The agreement creating Bluestem describes the nature of Bluestem operations and the character of the funds in the Bluestem account. This agreement provided all funds will be managed by Bluestem. The Bluestem funds are to be treated as public funds for the purposes of regulation, use, and investment. Moreover, Bluestem shall be governed by a Board of Directors to be appointed by both the Cedar Rapids City Council and the Linn County Board of Supervisors. Those appointed to Bluestem's Board of Directors were to be elected or appointed officials of the City of Cedar Rapids, Linn County, or any associate member. The agreement also provided in the event Bluestem did not have sufficient funds to support operating expenses, the City of Cedar Rapids and Linn County would supply the necessary money.