# IN THE SUPREME COURT OF IOWA

No. 21–0014

Submitted October 12, 2022—Filed January 6, 2023

**DOLLY INVESTMENTS, LLC,**

Appellant,

vs.

**MMG SIOUX CITY, LLC, DALE MAXFIELD,** and **MAXFIELD MANAGEMENT GROUP, LLC,**

Appellees.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Woodbury County, Jeffrey A. Neary, Judge.

A landlord appeals a breach of contract judgment, arguing it did not materially breach a lease agreement by changing the locks on a commercial building after the tenant failed to pay rent in full and abandoned the premises.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

Christensen, C.J., delivered the opinion of the court, in which all participating justices joined. May, J., took no part in the consideration or decision of the case.

Jacob B. Natwick and Zack A. Martin of Heidman Law Firm, P.L.L.C., Sioux City, for appellant.

Philip S. Bubb and Brandon R. Underwood of Fredrikson & Byron, P.A., Des Moines, for appellees.

**CHRISTENSEN, Chief Justice.**

This case revolves around a commercial lease dispute between a landlord and a tenant. Both landlord and tenant insist the other was first to materially breach the lease agreement, and both believe the other's material breach discharged their obligations to perform under the agreement. We resolve the case based on the legal effect of each party's breach rather than which party breached first. We conclude both parties breached the lease agreement—but only the tenant's breach was material and so only the landlord's duty to perform was discharged by that material breach.

**I. Background Facts and Proceedings.**

Marina and Leon Reingold, residents of California, equally own and operate an Iowa limited liability company called Dolly Investments, LLC (Dolly). In December 2016, the Reingolds purchased a commercial building located at 5230 Sergeant Road in Sioux City, Iowa, and conveyed it to Dolly. They purchased the building, which was subject to a fifteen-year lease, from a Utah limited liability company called Sioux City Golden Corral, LLC (Golden Corral). Golden Corral had leased the building to a Minnesota limited liability company called MMG Sioux City, LLC (MMG), for the purpose of operating a Golden Corral restaurant. Together, Tari and Dale Maxfield own MMG.[1] The lease itself started on March 1, 2016—about nine months before the Reingolds bought the building. For that reason, Golden Corral assigned its interest in the lease to the Reingolds,

---

[1]Both MMG and Dale Maxfield guaranteed the lease, which is why Dale Maxfield is listed as a defendant in this case.

which they later assigned to Dolly. Consequently, Dolly became MMG's new landlord.

The lease contained several notable provisions relevant to this appeal. Rent was due on the first day of the month, and the monthly rate for the first five years was $18,750. In addition, the lease agreement was a "triple-net" lease, meaning the tenant was obligated to pay property taxes, insurance, utilities, repairs, and maintenance costs. The lease also contained a no acceleration of rent clause.

More importantly, Article 13.1 of the lease governed the tenant's late or missed rent payments and the landlord's concomitant rights and duties. Article 13.1 defined failure to pay rent on time as a "breach." If the tenant breached on any given month's rent, the landlord was obligated to send a written notice to cure the breach within fifteen days. After that time, the tenant's failure to cure would constitute a "default."

In the event of a default, the landlord had two options. The landlord could either (1) terminate the lease, expel the tenant, reenter the property, and recover damages, including attorney fees, or (2) reenter the property, expel the tenant, and relet the property without terminating the lease.[2] Under the first option, the landlord's damages equal the present value of any unpaid rent as of the lease's termination, unpaid rent up to the time damages are awarded minus any amount of lost rent that the landlord could have avoided, and unpaid rent for the balance

---

[2]The lease reserves these two rights to the landlord but does not limit the landlord's right to "exercise . . . any other rights or remedies which," by reason of the default, are available at law or in equity.

of the lease term minus any amount of lost rent that the landlord could have avoided. The lease agreement was silent about what should happen if the landlord should breach any of its obligations to the tenant.

Initially, MMG's tenancy proceeded without incident. But during the second year of the lease, MMG was late to pay property taxes and a few months' rent. Around that same time, MMG and Dolly were pointing the finger at each other regarding who was responsible for fixing a problem with the property's underground drainage system. By April 2019, MMG emailed Dolly with concerns about affording the rent. MMG explained it could not continue to operate profitably at the current monthly rate. As a result, MMG said it needed to increase sales, decrease the cost of rent, or do both to survive.

When the June rent first came due, MMG failed to pay. However, at some point before June 25, 2019, MMG paid $9,375—half of the monthly rent. On June 9, MMG emailed Dolly about finding a new tenant. MMG suggested Dolly contact Tony Bailey, a Golden Corral franchisee who operated several other Golden Corral restaurants. About a week later, the Sioux City Journal published an article announcing the Golden Corral permanently closed on June 17. Two days later, Dolly emailed MMG about the overdue rent. Dolly informed MMG that the email was a final request and Dolly would exercise its legal rights against MMG without further notice unless MMG immediately complied with all lease provisions. MMG responded to this email a few minutes later, saying, "We do not have the rent at this time."

Sometime after this exchange, Leon Reingold received a phone call from his Sioux City banker, who held the mortgage on Dolly's building. The banker asked why Leon did not tell him the Golden Corral had closed. When Leon informed his banker that he was not aware the restaurant closed, the banker forwarded to him the Sioux City Journal article. Greatly concerned, the Reingolds travelled to Sioux City on June 25 to personally inspect the property.

At trial, the Reingolds testified about the state of the building when they arrived. Marina described smelling "a horrible stench" and seeing the countertops and carpet covered in dirt. She testified that "[e]verything in the kitchen looked like somebody poured a lot of grease . . . on all the equipment." In the building's office spaces, everything had been removed and wires were "sticking out everywhere." She also saw garbage strewn across the property, inside and outside. The buffet trays were "[i]n very bad shape" and looked "[v]ery old and dirty." Overall, the building was so filthy Marina would not touch anything she saw.

Likewise, Leon testified about his observations. He said the building looked abandoned and very dirty. He noticed trash and debris scattered throughout the property and a layer of grease covering the surfaces and equipment in the kitchen. Among other things, Leon observed scratched railings, chipped countertops, peeling walls, rusted stove burners, and a thick layer of dust on the window sills.

After their walkthrough on June 25, the Reingolds then decided to secure the property. They promptly changed the locks on the building, and they later

secured a realtor to find a replacement tenant. The day after the locks were changed, MMG's lawyer sent Dolly a letter. The letter stated MMG did not consent to Dolly reentering the property and changing the locks. It also disclaimed responsibility for maintenance, repair, insurance, and utilities, and it instructed Dolly not to remove MMG's furniture, fixtures, equipment, and other personalty from the premises. At the end of the letter, MMG expressed its desire to terminate the lease altogether and indicated it would contact Dolly soon to discuss termination. Noticeably absent from this communication, sent immediately after the Reingolds' impromptu walkthrough, was any request to either access the building or receive a new set of keys.

On July 3, Dolly's lawyers sent MMG a notice to cure the breach. At that point, MMG had paid neither the remaining half of the June rent nor any part of the July rent. The notice demanded MMG pay all outstanding rent within fifteen days and informed MMG of Dolly's intent to exercise its right to relet the property. The record does not say when MMG received this notice. By August 22, MMG had not paid the outstanding rent, so Dolly terminated the lease agreement and notified MMG accordingly.

On August 23, Dolly sued MMG for breach of contract and sought damages for unpaid rent, future rent, and future taxes. MMG answered, denying liability and counterclaiming for breach of contract and conversion. On September 1, 2020, approximately fifteen months after the Reingolds' walkthrough, a bench trial commenced. On October 14, the district court initially ruled for Dolly on the breach of contract claims. It concluded MMG materially breached the lease

agreement by failing to pay rent. It awarded Dolly damages of $290,625. This award was equal to the unpaid portion of the June 2019 rent plus fifteen months of unpaid rent, spanning from July 2019 to the date of trial. The district court also awarded Dolly attorney fees pursuant to Article 13.1 of the lease. On MMG's counterclaim for conversion, the district court concluded Dolly wrongfully deprived MMG of its furniture, fixtures, equipment, and other personal property. It awarded MMG $108,828.75 in damages for conversion.

Not long after, MMG filed a substantially successful motion to reconsider. The district court agreed to amend its original ruling and determined Dolly materially breached the lease by changing the locks without giving MMG written notice and a fifteen-day period to cure nonpayment. As a result, the district court reduced Dolly's damages to $9,375 to reflect the unpaid half of the June rent. The amended ruling did not affect the conversion or attorney fees awards.

Dolly filed an appeal, which we transferred to the court of appeals. The court of appeals affirmed the district court's amended judgment in all respects. Dolly then filed an application for further review. We granted that application, and we now partially affirm and partially vacate the court of appeals decision and reverse the district court's judgment.

**II. Standard of Review.**

"A breach-of-contract claim tried at law to the district court is reviewed by us for correction of errors at law." *NevadaCare, Inc. v. Dep't of Hum. Servs.*, 783 N.W.2d 459, 465 (Iowa 2010) (citing *EnviroGas, L.P. v. Cedar Rapids/Linn Cnty. Solid Waste Agency*, 641 N.W.2d 776, 780 (Iowa 2002)). "[T]he district court's

findings of fact are binding on us if they are supported by substantial evidence." *Id.* (citing *Falczynski v. Amoco Oil Co.*, 533 N.W.2d 226, 230 (Iowa 1995)). However, "[w]e will reverse a district court's judgment if we find the court has applied erroneous rules of law, which materially affected its decision." *Id.*

### III. Analysis.

Dolly makes three arguments in this appeal. Its first argument relates to repudiation. Dolly's second argument is that MMG materially breached the lease agreement by not paying the June 2019 rent in full and therefore discharged Dolly's duty to perform. The third argument is that Dolly did not materially breach the lease agreement. We consider the second and third arguments together because they encompass a single topic.

**A. Whether MMG Repudiated the Lease.** Dolly believes MMG repudiated the lease by both privately emailing that MMG could not pay rent and publicly announcing in the newspaper an intent to close the restaurant permanently. In that light, changing the locks did not materially breach the lease because MMG's repudiation had already excused Dolly from performing under the lease. In response, MMG contends Dolly failed to raise this argument at trial and thus failed to preserve error.

"It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut,* 641 N.W.2d 532, 537 (Iowa 2002) (citing *Metz v. Amoco Oil Co.,* 581 N.W.2d 597, 600 (Iowa 1998) (en banc)). Here, our review of the record shows Dolly never raised a repudiation argument below. In

fact, the pleadings never advanced a repudiation theory, neither party mentioned repudiation in the posttrial briefs, and the district court never ruled on the issue. Consequently, we agree with the court of appeals and affirm its decision on this point. Dolly did not raise this argument and therefore failed to preserve it for our review.

**B. The Effect of the Parties' Breaches.** Next, we turn to the parties' competing breach of contract claims. On this appeal, Dolly maintains its duty to perform under the lease was discharged because MMG was the first and sole party to materially breach the lease. In the alternative, Dolly also argues if it did breach, its breach was not material and did not excuse MMG's duty to pay rent. In contrast, MMG's argument centers on Dolly's failure to give MMG fifteen days to cure before changing the locks. MMG believes it could not have materially breached the lease for nonpayment of rent so long as Dolly had not satisfied the written notice and fifteen-day cure provisions of Article 13.1. Accordingly, MMG argues Dolly discharged MMG's duty to pay rent when Dolly materially breached the lease by changing the locks on June 25. Upon review, we conclude both Dolly and MMG breached the lease agreement, but only MMG's breach was material.

1. *Relevant legal principles.* As a prelude to our analysis, we emphasize the highly fact-sensitive nature of the breach of contract claims in this case. *See, e.g.*, *Beck v. Trovato*, 150 N.W.2d 657, 659–60 (Iowa 1967) (considering a case's "peculiar circumstances" to analyze a claim for breach of contract). In addition, our decision rests heavily on sections 241 and 242 provisions of the Restatement (Second) of Contracts. Restatement (Second) of Conts. §§ 241–42 (Am. L. Inst.

1981) [hereinafter Restatement (Second)]. Broadly speaking, section 241 sets out five factors for determining whether a contract breach is material. *Id.* § 241, at 237. Similarly, section 242 lists circumstances for determining when a nonperforming party's material breach discharges an injured party's contract duties. *Id.* § 242, at 244. One of section 242's relevant circumstances is the five materiality factors from section 241. *Id.* § 242(a), at 244. In this way, section 242 incorporates and adds to the substance of section 241. *See id.*

Parties to a contract can explicitly or implicitly define what constitutes a material breach. Indeed, many lease agreements specify that nonpayment of rent is a material breach of contract. *See, e.g.*, *Kimp v. Fire Lake Plaza II, LLC*, 484 P.3d 80, 87–88 (Alaska 2021) ("Rent was due on the first of the month, and failure to make timely payment was grounds for immediate default, entitling Fire Lake to exercise any and all remedies available to it under the lease.").

If a lease agreement defines whether a breach is material, the agreement terms will be followed. If a lease is silent about whether a breach is material, we apply the five-factor approach of section 241 of the Restatement (Second). *E.g.*, *Van Oort Constr. Co. v. Nuckoll's Concrete Serv., Inc.*, 599 N.W.2d 684, 692 (Iowa 1999). That section defines a breach as "a failure to render or to offer performance" and explains such failures may be material if they (1) deprive an injured party of a reasonably expected benefit, (2) cannot be adequately remedied, (3) produce a forfeiture in the nonperforming party, (4) are not likely to be cured by the nonperforming party, and (5) result from the nonperforming

party's failure to comply with standards of good faith and fair dealing. Restatement (Second) § 241, at 237.

2. *MMG's material breach.* In this case, we analyze whether MMG's breach is material in light of the lease agreement's language. We do not need to consult the five section 241 factors of the Restatement (Second) because the lease itself contains provisions about the tenant's failure to pay rent and the landlord's concomitant rights and duties. These provisions implicitly define the circumstances under which the nonpayment of rent amounts to a material breach. In light of these provisions, we conclude MMG materially breached not by missing rent payments but rather by failing to cure its nonpayment of rent within fifteen days of receiving written notice.

By the lease's plain terms, mere nonpayment of rent may be a breach but is not automatically a material breach. In Article 13.1, the lease uses the word "breach" to describe the tenant's failure to pay rent. When the tenant breaches by failing to pay rent, the landlord must send a written notice giving the tenant fifteen days to pay the outstanding rent. The lease does provide that the breach for nonpayment of rent suspends or discharges the landlord's duties. This means MMG did not immediately materially breach the lease by failing to pay taxes or rent on time.

At the same time, we infer that Article 13.1's provision about default establishes that the tenant's nonpayment of rent becomes a material breach after the fifteen-day cure window closes. The agreement provides that the uncured failure to pay rent triggers the landlord's right to expel the tenant and either

terminate the lease or relet the property without terminating the lease. Consequently, default on this lease gives rise to the types of remedies that contract law traditionally attributes to material breaches. *See Ryan Data Exch., Ltd. v. Graco, Inc.*, 913 F.3d 726, 733–34 (8th Cir. 2019) ("Under Iowa law, only a material breach could excuse . . . nonperformance." (citing *Kelly v. Iowa Mut. Ins.*, 620 N.W.2d 637, 641 (Iowa 2000) (en banc); *Van Oort*, 599 N.W.2d at 692)).

Because the lease agreement defines default and material breach in this way, we need not analyze whether a default is a material breach under the Restatement (Second). Under the lease terms, MMG nonmaterially breached the lease by failing to pay the June and July rent. On July 18, fifteen days after Dolly sent a written notice to cure, that breach became material because MMG failed to cure by paying the rent it owed.[3]

3. *Dolly's nonmaterial breach.* Here, we analyze Dolly's breach under section 241 of the Restatement (Second). We look to the Restatement (Second) because the lease agreement is altogether silent about what should happen if the landlord breaches its obligations to the tenant. For this analysis, Dolly is the party failing to perform, MMG is the injured party, and the breach is Dolly's conduct in changing the locks without providing a notice of breach and fifteen-day opportunity for MMG to cure.

In the balance, we conclude Dolly's breach was not material. In light of the facts and circumstances here, we conclude the first four section 241

---

[3]The record does not reflect when MMG received the notice, so we assume MMG received it on the day Dolly sent it. Under this assumption, the fifteen-day curing period ended on July 18.

Restatement (Second) factors weigh against concluding Dolly's breach was material and the fifth is neutral. Before analyzing the five section 241 Restatement (Second) factors, we note that our conclusion does not establish a bright-line or per se rule—while the landlord did not materially breach by changing the locks under these facts, slightly different circumstances could result in a different outcome. *See Nora Springs Coop Co. v. Brandau*, 247 N.W.2d 744, 749 (Iowa 1976) (explaining the obvious importance of facts and circumstances in deciding whether a breach is material).

First, Dolly did not deprive MMG of a reasonably expected benefit. In a typical landlord–tenant case, changing the locks on a tenant would deprive the tenant of the all-important benefit of use and enjoyment of the leased premises. But not so here. The evidence supports a determination that MMG had already abandoned the building. It renounced its intention to operate the restaurant, removed everything down to the electrical wires from the office space, and allowed the building to fall into squalor. The trial testimony about the building's condition—from the chips and cracks to the grease, stench, and scattered refuse—convincingly shows MMG had no intent to continue to operate a restaurant and therefore lost no benefit when Dolly changed the locks.

Even more, additional trial testimony further supports the conclusion MMG did not lose out on any reasonably expected benefit. In the June 26 letter, MMG never requested keys or access to the building after Dolly changed the locks. Instead, MMG attempted to distance itself from its lease obligations; it asked for mutual rescission of the lease and disclaimed its responsibility to pay

insurance, utilities, and maintenance costs. In reality, Dolly arguably conferred a benefit on MMG by changing the locks. New locks protected both Dolly's interest in its mortgage on the property, and it also protected MMG's interest in the furniture, fixtures, and equipment that formed the basis of MMG's conversion claim.

Second, Dolly could have easily compensated MMG for any benefit lost due to the lock change. Because MMG apparently abandoned the building, MMG suffered only minor inconveniences or costs in not being able to access the empty restaurant. Dolly did not disrupt an ongoing business operation, nor did Dolly interfere with any planned maintenance work or tours of the building for potential tenants. And so Dolly could have easily and adequately compensated MMG with, for example, rent abatements equal to the amount of time Dolly locked out MMG or MMG's opportunity cost for not being able to show the building. Alternatively, if MMG wanted to reenter the building, Dolly could have easily given MMG keys for the new locks. In fact, Leon testified he would have allowed MMG to continue operating the Golden Corral if MMG had just asked.

Third, Dolly did not suffer forfeiture on account of its decision to change the locks without notice to MMG. In truth, changing the locks was important to securing both Dolly's financial interest and the bank's security interest in the building. Former employees, including teenagers or young adults, likely had keys to the restaurant and could have accessed it for improper purposes. From this perspective, Dolly's actions potentially circumvented a forfeiture or any similar

adverse actions the bank might have taken if the restaurant locks were not changed.

Fourth, Dolly was likely to succeed in curing its own failure. All Dolly needed to do was either provide new keys or send a written notice of breach to MMG. In fact, Dolly was eager to do the former and let MMG resume operating the restaurant. In the end, Dolly did the latter, sending written notice on July 3, which gave MMG fifteen days to cure its nonpayment of rent.

Finally, Dolly does not appear to have conducted itself below the standards of good faith and fair dealing. At trial, Leon testified that he believed he had the right to change the locks when he did. Even though he was mistaken, his mistake does not amount to bad faith or unfair dealing. The record reveals no examples of bad faith or unfair dealing, and MMG never accused Dolly of either. On the whole, this factor appears to have neither helped nor harmed Dolly.

4. *The consequences of MMG's material breach.* Having established that MMG's breach was material and Dolly's breach was not, we now examine the legal consequences of MMG's material breach. We start with an overview of the typical legal consequences of a material breach.

If a lease agreement specifies the consequences of a material breach, the agreement's terms will be followed. However, when a lease is silent on the matter, Restatement (Second) section 242 will apply. Section 242 provides that a material breach does not automatically discharge the injured party's obligation to perform under the contract. Restatement (Second) § 242, at 244. Rather, a material breach temporarily suspends the injured party's duty to perform. *Id.*

Then, if the materially breaching party does not cure, the injured party's duty is discharged. *Id.* In other words, "a party's uncured material failure to perform . . . has the effect of suspending the other party's duties" to perform. *Id.* § 242 cmt. *a*, at 244; *see also Van Oort*, 599 N.W.2d at 693 (holding that the defendant "was justified in suspending its performance under the contract until" the plaintiffs performed under the contract). Then when it is too late for the first party to perform, the injured party's duty to perform is finally discharged. Restatement (Second) § 242 cmt. *a*, at 244. Section 242 sets out three factors to guide courts in determining when the period of suspension ends and the injured party's obligations are discharged. *Id.* § 242, at 244.

There appears to be some confusion on this point, probably due to pronouncements in caselaw "that once one party to a contract breaches the agreement, the other party is no longer obligated to continue performing his or her own contractual obligations." *Kelly*, 620 N.W.2d at 641 (quoting 2 Allan D. Windt, *Insurance Claims & Disputes* § 3.10, at 139 (3d ed. 1995)). Material breaches do often result in a discharge of the injured party's contract duties. *Fullerton v. U.S. Cas. Co.*, 167 N.W. 700, 705 (Iowa 1918). But not always. Again, district courts should first apply relevant lease provisions that provide specific consequences for a material breach. *See, e.g., Klein v. Ickovitz*, 219 N.E.2d 73, 74 (Ill. App. Ct. 1966) (applying lease terms that vary default rules about suspending rent payments in instances of eviction). In the absence of such provisions, the courts should apply Restatement (Second) section 242.

In this case, we do not need to apply Restatement (Second) section 242 because the lease agreement explains what happens to the landlord's obligation to perform when the tenant defaults. The lease agreement defined a default as MMG's failure to cure nonpayment of rent within the fifteen-day window, and it also provided Dolly with two sets of alternatives in the event of a default. Given that MMG's default is a material breach, as explained previously, the default's legal consequences flow from Dolly's choice to exercise the alternatives available to it under Article 13.1. Once the cure window closed on July 18, MMG clearly defaulted. This material breach suspended Dolly's duty to perform just like the material breach suspended the obligation to perform in *Van Oort Construction Co. v. Nuckoll's Concrete Service, Inc.*, 599 N.W.2d 684. With its performance obligations suspended, Dolly exercised its Article 13.1 right to terminate the lease and expel MMG on August 22. At that same time, Dolly discharged its own obligation to perform and, by the lease's terms, made itself eligible to recover damages.

**IV. Conclusion.**

In summary, both Dolly and MMG breached the commercial lease. MMG's breach was material; Dolly's breach was not. MMG's material breach suspended Dolly's duty to perform during the fifteen-day cure period. Once that period ended, Dolly's duty to perform was discharged.

We remand for the district court to award Dolly breach of contract damages based on the existing record. Under Article 13.1 of the lease, the proper measure of damages equals the award in the district court's first, unamended

order. That award is $290,625 and represents the unpaid rent between June 1, 2019 and the end of September 30, 2020, the last day of the month in which trial was held. *See C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 77 (Iowa 2011) (deferring to the parties' written agreement for a breach of contract remedy).

This disposition does not affect the district court's previous conversion and attorney fees awards.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

All justices concur except May, J., who takes no part.